## WOODS v. KALAMAZOO PAPER BOX CO.

MASTER AND SERVANT—INFANTS—DANGEROUS OCCUPATION—STAT-
UTES.

> Where a girl of 15 years was employed by defendant in viola-
> tion of the requirements of Act No. 285, Pub. Acts 1909, as an
> operator of a box-making machine that was operated by
> means of a treadle, which, upon being tripped, released a ham-
> mer or plunger, and where she tripped the machine while her
> finger was beneath the plunger, which descended and pinched
> it, and where there was no necessity for her to place her
> hand in the machine, she was, as a matter of law, guilty of
> contributory negligence barring her recovery.[1]

Error to Kalamazoo; Knappen, J. Submitted Novem-
ber 6, 1911. (Docket No. 40.) Decided December 8,
1911.

Case by Jessie Woods by her next friend against the
Kalamazoo Paper Box Company for personal injuries.
Judgment for plaintiff. Defendant brings error. Re-
versed, and no new trial ordered.

*A. M. & C. H. Stearns* (*Fred L. Vandeveer*, of coun-
sel), for appellant.
*Fred A. Mills* and *Harry C. Howard*, for appellee.

OSTRANDER, C. J. Plaintiff was employed by the de-
fendant in the manufacture of paper boxes at a machine
called a "stayer machine," which performed the operation
of fastening a gummed tape upon the corners of boxes.
The gummed tape was contained in a roll in the machine,
and was automatically fed by the machine towards the
front thereof and towards the operator as the work pro-

---

[1] On question, May one employing child under statutory age rely
on contributory negligence or assumption of risk, to defeat liability
for personal injuries? See notes in 12 L. R. A. (N. S.) 461, and 20
L. R. A. (N. S.) 876.

gressed; the tape being moistened as it passed from the roll, or coil, to the boxes. At the front of the machine was a small piece of metal which served the purpose of an anvil, and just above it was the orifice, through which the tape was fed. In the process of manufacturing, a corner of the box was placed on this anvil, sufficient of the tape was fed through the orifice over the anvil, and a plunger or hammer, working vertically, descended and struck the tape and the corner of the box, fastening the tape in place; the same motion cutting the tape. Power was supplied by electricity. On the 1st day of October, 1909, plaintiff was injured by having one of her fingers struck and pinched between the descending hammer and the anvil. She brought suit, and recovered a substantial verdict, which the court declined to set aside.

She avers in her declaration that when she was hired by the defendant, and at the time of her injury, she was but 15 years of age, and was employed at work dangerous to life and limb; that the defendant did not keep a register in which was recorded the name, birthplace, age, and place of residence of the plaintiff, and did not have on file in its business office a permit issued by the superintendent of schools for the school district in which plaintiff resided or by the person in charge of any State employment bureau or by the probate judge of the county, all contrary to the provisions of Act No. 285, Pub. Acts 1909. Breaches of statute duties are averred, as well as neglect to properly instruct her in the proper use of the machine.

We find it unnecessary to discuss many of the interesting questions debated by counsel, because we are of opinion that upon her own showing plaintiff was not entitled to recover. Assuming, but not deciding, that her employment violated the statute declared upon, and that the negligence of the defendant which is averred was in other respects established, it appears that plaintiff is herself responsible for her injury. It is conclusively established that the hammer, the blow from which is said to have caused the injury, is in motion only when the operator of

the machine sets it in motion, and that it is set and kept
in motion by a treadle or lever which the operator presses
with her foot.   If the machine is at rest for any length of
time, that portion of the gummed tape which has passed
the point at which it is moistened becomes dry and stiff
and useless.   In such cases the operator, the machine
being at rest, uses a pair of pinchers to take hold of the
tape and pull it out sufficiently so that the moistened por-
tion thereof can be applied to the corner of the box.   On
the day when the plaintiff was injured, she left her ma-
chine for a time, and, upon returning, she found the tape
dry.

What she then did, and the manner in which she re-
ceived her injury, was detailed by her upon her cross-ex-
amination as follows:

"*Q.* I wish you would tell me just what you were do-
ing, and how this accident occurred?
"*A.* I was fixing a box.
"*Q.* Show the jury.   You told us about the anvil.
Show the jury what you did.
"*A.* I was just putting it up on the anvil.
"*Q.* Tell us what you did.
"*A.* That thing came down on my finger.
"*Q.* Accidentally, you tripped the machine, didn't you?
"*A.* I guess so.
"*Q.* You knew the machine would not plunge down
without it was released, didn't you?
"*A.* Yes, sir.
"*Q.* You also had to press your foot to have the plunger
come down, didn't you?
"*A.* Yes, sir.
"*Q.* Now, the function of that machine was what, the
work it did?
"*A.* Just taking a little paper on there and keeping the
corners together.
"*Q.* That was pasting on a piece of paper?
"*A.* Yes, sir.
"*Q.* It has an automatic feed, this stayer machine?
"*A.* Yes, sir.
"*Q.* When this comes down, it is cut off, is that correct?
"*A.* Yes, sir.
"*Q.* And this strip is pasted on the corner of the box?

"*A.* Yes, sir.

"*Q.* You said in answering some question that that was cut by a knife that was in the machine ?

"*A.* Yes, sir.

"*Q.* Now the knife that was in the machine, if it was a box 2½ inches deep, would have to be at the extreme end, would it not ?

"*A.* Yes.

"*Q.* The knife, to cut that, must at least have been the depth of the box from the front end of the machine, is not that correct ?

"*A.* Yes, sir.

"*Q.* It was that knife you got cut on ?

"*A.* Yes, sir.

"*Q.* Your finger was not jammed on the anvil was it ?

"*A.* The end was jammed.

"*Q.* The end of the finger was jammed ?

"*A.* Yes, sir.

"*Q.* But it was also cut there ?

"*A.* I think that way.

"*Q.* You got cut in that operation. It was a cut, as well as a bruise, I understand you ?

"*A.* Yes, sir.

"*Q.* So that at least you must have had your finger straight from the front the full depth of the box you were at that time making to have got it caught ?

"*A.* The machine came down on my finger.

"*Q.* When you came there in the morning, what was the first thing you did in the morning or afternoon, after you had been working on the machine ?

"*A.* I would go right to work.

"*Q.* What was the first thing necessary to be done ?

"*A.* Why, run the paper out so that it would not be dry. When the machine had been standing, the paper that had been gummed would have dried, and it was necessary to pull that paper or tape out far enough so it would get a fresh start so far as the gum was concerned. I had to do that in the morning before starting to work and in the afternoon before starting or at any time when I left the machine for any considerable length of time. This accident occurred about 4 o'clock in the afternoon. It was towards evening. It was not real light or real dark. We didn't have any electric turned on.

"*Q.* Now, let me refresh your recollection a little, and ask you whether or not at the time this accident occurred

if you hadn't left the machine for a few minutes, and had come back and was pulling out this tape, preparatory to making a box?

"*A.* I think I was making a box when I got hurt. I think I am positive about that.

"*Q.* Let me see if I can refresh your recollection. How do you get that paper out when you start to work in the morning?

"*A.* Take a pair of pinchers and pull it out. These pinchers are furnished and lay there on the machine. When Mr. Smith showed me how to operate the machine, he took those pinchers, and showed how it was done and pulled it out.

"*Q.* Let me ask you whether or not this accident did not occur after you had left the machine for a short time, and had returned and had got your pinchers, and reached in with this hand, and the accident occurred in that way while you were pulling out this tape, rather than at a time when you were making a box?

"*A.* I think I was pulling the paper out. I pulled it out with the pinchers, then took a hold of it after it was out of the machine.

"*Q.* Was it not then exactly as I have described it to you?

"*A.* Yes, sir.

"*Q.* You started to pull the paper out with the pinchers that were furnished for that purpose, and you reached in to get a further grasp with this finger with this hand and got caught at that time?

"*A.* I didn't reach in there?

"*Q.* What did you do with this hand, you had the pinchers in one hand?

"*A.* I had hold of the paper, but didn't have it in the machine.

"*Q.* You must have had your finger in the machine at the time of the accident, didn't you?

"*A.* I had hold of the paper, but it was not under that machine part that came down.

"*Q.* What was it that struck your hand?

"*A.* I don't know. All I know is I got my finger in there.

"*Q.* You had hold of the paper with your hand pulling it out?

"*A.* I had it pulled out with the pinchers, then took hold with this hand.

"*Q.* You had taken it out with the pinchers, then took hold with this hand?

"*A.* Yes, sir.

"*Q.* It was that hand, that finger, the middle finger of this hand that the plunger came down upon while you still had hold of the paper?

"*A.* Yes, sir.

"*Q.* Had Mr. Smith showed you how to pull that paper out?

"*A.* Yes, sir.

"*Q.* He had told you that the pinchers were there for the express purpose of doing that, and you used them for that purpose partly, and reached in with this hand and pulled it out and got caught?

"*A.* I always used the pinchers in pulling the paper out. I don't know how that finger got in there.

"*Q.* I understood you to say you put it in there?

"*A.* I didn't put it in the machine.

"*Q.* You didn't put the finger in the machine that got hurt?

"*A.* No, sir.

"*Q.* How on earth did it get hurt then?

"*A.* I don't know."

The machine, or one like it, was produced at the trial, and with it before her plaintiff was recalled and further examined by her counsel, and testified as follows:

"*Q.* Did Mr. Smith tell you that you must use the pliers in all cases, and not your fingers; that the pliers would be supplied, etc.? Did he tell you all those things I have read in the notice?

"*A.* Yes, sir.

"*Q.* He told you that you must not use your fingers?

"*A.* Yes, sir.

"*Q.* Did you use your fingers in the machine?

"*A.* No, sir.

"*Q.* Where were they?

"*A.* I just took hold of the paper like you do.

"*Q.* As I hold them now?

"*A.* I don't think they were so far under. That piece you have your fingers on would come down and hit your fingers, if you had them there.

"*Q.* You mean the guards?

"*A.* No, sir; the other part. The guards were up when I had the machine.

"*Q.* Come here on this chair, and we will operate the machine. On your cross-examination you undertook to explain to Judge Stearns, I believe, that if somebody else came along and put their foot on the treadle, and you didn't know about it when you were out, and the machinery was shut down and you came in and the machinery started up while you were at the machine, that you might get caught, and you might not know about the person being in there?

"*A.* Yes, sir.

"*Q.* Now, when you went out to dinner, the machine was shut down?

"*A.* Yes, sir.

"*Q.* We will concede that you had been out to dinner and did not know, and I will put my foot on the clutch here. Now the machine is quiet. Do you mean that coming after somebody had touched the treadle like that, that the machine would trip without the aid of your foot, was that what you were trying to state?

"*A.* Yes, sir; I don't say they did that. They might have done it. This treadle throws on the power and propels the machine."

And on cross-examination she further testified:

"*Q.* Now, this accident occurred, if I understand it right, Jessie, after you had returned from being absent for a time?

"*A.* Yes, sir. We had been watching out the window of the third floor, watching a balloon, as it was going up. I had been down and back, talking to one of the girls just before this accident. When I left the machine, I took my foot off the treadle that released it.

"*Q.* Then you went away and was looking out the window watching a balloon and talking with the girls. About how long were you absent?

"*A.* Well, I don't know. I don't think over 15 minutes. It was long enough for the paste to dry in my absence, and the tape had to be pulled out when I went to work again. I had to pull it out on this occasion. No one had interfered with the machine on this particular occasion, not that I know of. I didn't see any one around there. I didn't find anything to indicate that any one had interfered with it.

"*Q.* When you came back, if I understand you correctly,

this accident occurred, while you were pulling out the paper ?

"*A.* Yes, sir.   It was not while I was making the box at all.   I had the box in my lap, and didn't have it in my hand.   I came back and set down to the machine, and started to pull the paper out, and put my foot on the treadle, and that started it, and it came down and caught my finger.   I had the paper out beyond the upright part there. I had it out from the anvil a few inches, about so far (illustrating).   I had hold of it with the pliers with the right hand and put my left hand around here (indicating) to pull it out better, because these little pliers would not hold on to the paper real good.   They slipped.   The paper was very hard to pull out.   You would have to take something more than the pliers.   They would not hang onto the paper good.   When I put my hand around here, I kept it away from this part.   I knew that, if I got it under there and touched the treadle, there would be danger.

"*Q.* How do you explain that the accident occurred, if your finger was not under there ?

"*A.* It was done so quick I don't know how it was done, but I know that I would not stick my finger under there when I knew it was dangerous.

"*Q.* Is not this true, were you not a little careless about it, when you were pulling this out, were you not talking with some of the girls ?

"*A.* No, sir; I was paying attention to what I was doing absolutely.

"*Q.* You would not put your foot on the treadle there, unless you got it in shape, would you ?

"*A.* No, sir.

"*Q.* How did you come to put your foot on there before you got it in shape ?

"*A.* I had it in shape before I put my foot on there.   When I thought I had it out far enough, I put my foot on there.   I know I was looking at it, and that I had it out far enough and I put my foot on there and set it to working.   I know I was looking right at it at the time.   I knew that, if I got my finger under there, I was liable to get caught.   I am satisfied that I did not have my finger under there when I pushed down the treadle.

"*Q.* Is there any possible way you can explain to the jury how your finger got caught, if it was not under there ?

"*A.* I don't know.

"*Q.* Are you sure you were not talking with either one of these girls at the time this accident occurred or immediately before?

"*A.* When I was working the machine, I didn't talk to anybody. If I stopped to talk to anybody, I didn't work.

"*Q.* My question goes to the identical moment that you had this accident, as to whether or not just at that moment or a moment before you were talking with either of these girls?

"*A.* A few moments before, I had been, I own, but then I was looking at what I was doing.

"*Q.* During the time you were engaged in pulling this paper out and starting the machine, during that time, you were not talking with either of the girls?

"*A.* No, sir; and I was not looking over my shoulder, but was paying strict attention to my business. I knew when I put my foot on there, that the machine would start and I knew if I had my finger under there, that I would get caught.

"*Q.* Did you put your foot on there purposely or accidentally?

"*A.* I put it on there to cut that paper off.

"*Q.* Did you do it accidentally or on purpose?

"*A.* I guess I did it on purpose.

"*Q.* I understood you to say on your examination a while ago that it was accidental?

"*A.* No, sir; I didn't say that. In order to start the machine, I had to put my foot on there to chop off that paper."

On further redirect examination, she said:

"*Q.* Do you know whether your finger was anywhere near that anvil or on the anvil?

"*A.* I thought it was just pushed far enough so I would not get hurt. The knives are back near the end of the anvil. I do not mean to be understood that I got hurt back there.

"*Q.* When the plunger comes down and you have hold of the paper, do you know whether the tendency might be for the paper to draw back into the machine?

"*A.* Why I don't think it would draw back any.

"*Q.* You think you had your hand clear of it?

"*A.* Yes, sir.

"*Q.* But the finger guards were not down at all?

"*A.* I didn't know what those were then. They hadn't

been explained to me. I have seen them operated here today. This is the first time I ever saw them operated, but one of the girls told me after the accident about them.

"*Q.* You didn't mean to say that while you were looking at the balloon somebody may have tripped the machine?

"*A.* No, sir. The machine was running all the time, so that, if any one in my absence had touched the treadle, it would have operated before I got back any way."

The machine and the method of its operation were exhibited to this court at the argument. The guards referred to in the testimony were attachments on either side of the anvil, designed to protect the hands of operators when holding the boxes in place to receive the gummed tape. Sometimes operators turned these guards up out of the way because they could thus work faster. Whether they were in place on this machine, or whether plaintiff had been instructed to keep them in place, is immaterial. They presented no barrier to the act of putting the pliers or the finger directly into the machine, and their presence, in position, would not have prevented the injury. Giving to plaintiff's testimony the greatest probative force, it shows no connection between defendant's alleged negligence and her injury, unless her employment to operate the machine was a violation of the statute. If it was a violation of the statute, her own conduct may nevertheless be considered to determine whether she was herself at fault. Upon this question her testimony is conclusive. She tripped the machine—set it in motion—while her finger was in the machine, over the anvil. She was not ignorant of the danger or of the consequences of what she did. Unless the machine moved, she was in no danger. It could not move unless she set it in motion. She had no occasion to place her finger in a position where it could be injured, and none to start the machine when it was in such a position.

The judgment is reversed, and no new trial will be granted.

STEERE, MOORE, BROOKE, and STONE, JJ., concurred.