EDITH E. BOESEL, an Infant, by ADAM BOESEL, her Next Friend, Appellant, v. WELLS FARGO & COMPANY.

In Banc, July 14, 1914.

1. **CONTRIBUTORY NEGLICENCE: Not Pleaded.** To render contributory negligence available as an affirmative defense it must be pleaded; but notwithstanding it is not pleaded, if plaintiff's proof shows his contributory negligence to an extent barring recovery as a matter of law, such negligence is available to defendant in support of its demurrer to the evidence, which, in that case, should be sustained. But if contributory negligence is not pleaded, an instruction to the jury based on defendant's proof tending to establish it should not embody it.

2. ———: ———: **No Appeal by Defendant.** Even though defendant · has not appealed, and is manifestly satisfied with the verdict rendered for it, yet if plaintiff's evidence established contributory negligence (though not pleaded) to such an extent that, as a matter of law, it forbids a judgment in his favor, the judgment will not be reversed.

3. ———: ———: **Child.** Plaintiff, a child a few months under fifteen years of age, was told by defendant's foreman, at its barn, that he was going to an upper story and if the telephone rang to call him, and, in coming to call him, to use the elevator, which was made to ascend and descend by two wire ropes. As the elevator passed the second floor, there was a vacant space of about two inches between the edge of that floor and the edge of the elevator's floor. Plaintiff testified that she had used the elevator a hundred times for the same purpose in the preceding three months; that she learned to operate it in a very short time; that she had never sat down on the elevator floor before; that she knew there was a crack between the edge of the elevator and the second floor; that she had seen it often as she went up; that it looked as though it would be wide enough for her leg to go through without hitting or touching her leg at all; that, when the telephone rang, she sat down on the floor, permitted her leg to hang over the side of the elevator, and pulled at the rope, and when the elevator reached

the second floor, the knee was hurt. *Held*, that, as a matter of law, considering her age and the circumstances, she was guilty of contributory negligence, and cannot recover on the common-law count of her petition.

4. **NEGLIGENCE: Employing Child to Operate an Elevator: Penal Statute.** The statute (Sec. 1723, R. S. 1909) making it a misdemeanor, in either parent or employer, to employ any child under sixteen years of age in operating or assisting in operating any passenger or freight elevator, is a penal statute, and like other penal statutes must be strictly construed, and in order for plaintiff to recover civil damages for a violation thereof, since it imposes no liability but the criminal one, the evidence must clearly establish a criminal infraction thereof, namely, that plaintiff was in fact employed by defendant. Furthermore, if the injury is one that happened by causes independent of a violation of the statute, no action arises on the basis of a violation thereof.

*Held*, by WOODSON, J., concurring, that the statute (Sec. 1723, R. S. 1909), means that plaintiff, being under sixteen years of age, could not in any legal way be employed to operate or assist in operating an elevator, and should not be shorn of its humane purpose (as was the railroad trespass statute —by the humanitarian doctrine) by any unnatural or strained construction; but the judgment should not be reversed, because no reasonable man can give credence to the unnatural story told by plaintiff that she was told by defendant's foreman that he was going to the third story of the barn and if she would call him when the telephone rang he would give her a quarter and to use the elevator when she came to call him.

5. ———: ———: ———: **Permission of Mother.** Testimony in such case that defendant had notified the mother of plaintiff to keep her away from the barn where the elevator was operated, is competent evidence (by reason of the provisions of the statute relied on) on the question of whether said child was employed to operate the elevator.

Appeal from St. Louis City Circuit Court.—*Hon. W. B. Homer*, Judge.

AFFIRMED.

*W. E. Knowles* and *Earl M. Pirkey* for appellant.

(1) The violation of a statute forbidding the employment of a child is negligence *per se*. Brombey v. Laundry Co., 134 Iowa, 45; Marino v. Lehmaier, 173

N. Y. 530; Strafford v. Iron & Steel Co., 238 Ill. 371; Car & Foundry Co. v. Dimentraut, 214 Ill. 509; Lore v. Am. Mfg. Co., 160 Mo. 622. These cases also held that contributory negligence is no defense. (2) An instruction requiring the jury to find that defendant's negligence was the sole cause of the injury is erroneous. Wallach v. Transit Co., 123 Mo. App. 168; Newcomb v. Railroad, 169 Mo. 431; Harrison v. Light Co., 195 Mo. 623. Negligence of a parent cannot be imputed to a child suing in its own right. Berry v. Railroad, 214 Mo. 603; Neff v. Cameron, 213 Mo. 350. Minors are not expected to exercise the care of adults. Whether a minor exercises proper care is almost always a question for the jury. Obermeyer v. Chair Mfg. Co., 229 Mo. 106; Shortridge v. Scarritt Estate, 145 Mo. App. 295. Contributory negligence to be availed of must be pleaded in the answer. Hughes v. Railroad, 127 Mo. 453; Meily v. Railroad, 215 Mo. 588; White v. Railroad, 250 Mo. 476; Collett v. Kuhlman, 243 Mo. 591. Where contributory negligence is not pleaded defendant can avail himself of the defense only when plaintiff's evidence so clearly shows contributory negligence that the case must be taken from the jury. Stewart v. Railroad, 142 Mo. App. 324; State ex rel. v. Hallen, 146 S. W. 1176. Instructions undertaking to select certain portions of the evidence and commenting on the force and effect thereof are erroneous. Barr v. Kansas City, 105 Mo. 559; Connolly v. Railroad, 120 Mo. App. 652; Williams v. Stevens, 38 Mo. App. 164; State v. Mitchell, 229 Mo. 697. (3) The law does not require a litigant to voluntarily give his deposition. It cannot be taken where plaintiff must be present to make out his case. Bispham on Equity (6 Ed.), p. 682, sec. 561; Matthews v. Railroad, 142 Mo. 668; Ess v. Griffith, 139 Mo. 322; Tyson v. Sav. & Loan Assn., 156 Mo. 595; Ex parte Kreiger, 7 Mo. App. 374.

*W. F. Evans* and *E. T. Miller* for respondent.

(1) Plaintiffs' testimony itself does not show that she was an employee of defendant. The purpose of the statute, as shown by the title to the Act of 1907, was to "regulate the employment" of children in gainful occupations, and the term "employed" as used in the statute, must be given its plain and ordinary meaning. Railroad v. Wilson, 138 U. S. 505. Again, even upon plaintiff's testimony in support of her theory, she was not employed to "operate or assist in operating" the freight elevator. If she was employed, she was employed to answer the telephone, and her evidence cannot show a violation of this criminal statute by defendant. (2) Plaintiff's negligence was shown by plaintiff's own testimony, and the defense of contributory negligence was open to defendant. Allen v. Transit Co., 183 Mo. 424.

FARIS, J.—This case coming into Banc from Division Two, we adopt with some minor emendations, the statement thereof made by Roy, C., who wrote the opinion in Division. It runs thus:

Suit for damages for personal injuries. Verdict and judgment for defendant, from which plaintiff appeals.

The defendant had its barn at the northeast corner of Johnson and Spruce streets in St. Louis. It fronts south on Spruce. It is 75 feet front by 175 feet deep. The office is on the first floor in the southeast corner. That floor is used for vehicles. At the north end of the building is a freight elevator about thirteen feet by nine. It is operated by wire cables. Across the south opening to the elevator is a wooden removable bar about three feet high. Near the elevator begins a chute by which horses are taken to and from the stalls on the second floor. Hay and other feed is kept on the third floor. Near the foot of the chute

is an extension bell from the telephone, which rings whenever there is a call on the telephone. As the elevator passes through the second floor there is a space of about two inches between the edge of the elevator and the side of the opening in the floor. John Hodgson was the foreman in charge of the barn.

The plaintiff lived with her parents in the property adjoining the barn on the west. The plaintiff was injured on August 19, 1909, and was fifteen years old in December following. The injury occurred between five and six o'clock in the afternoon. Plaintiff testified as to what occurred between her and Hodgson and as to how the injury occurred, as follows:

"I was called into the building by John Hodgson; he was the stable boss; bossed the men and worked some himself. He was working for the Wells Fargo Express Company.

"Q. What did he say to you? A. *He told me if I would answer the telephone he would pay me for it.*

"Q. Now, tell what he said and what you said on this occasion? A. He called me into the office in the stable and asked me if I would answer the telephone; I told him yes, and asked him how much he would give me; he said he would pay me to-night. He said he was going up to the third floor to get some sacks to clean the chute out with, and told me if a call came in to use the elevator and not to go up the chute, because he was afraid the horses would kick me, and then a call came for him and I went and used the elevator. When a call came for him I got on the elevator. That was after he told me he was going to the third floor. When I got on the elevator, I pulled the wire that made the elevator go up; *I went pretty near to the third floor.* Then I was called down and I came down to the bar. *My little brother called me down,* and when I got down I stopped the elevator there. When I got down I put my leg over the bar. That bar was about three feet

above the floor.   My brother was in the chute at the time he called, but before I got down he went out of the chute and went on the second floor; I did not get off the elevator at all.   Then I started to the second floor to get John Hodgson.   As I went up my leg got caught .between the elevator and the second floor and was crushed.   The elevator does not fit close against the second floor.   There is a space between them; I couldn't just exactly tell how wide it was.   It looked as though it would be wide enough for my leg to go through without hitting or touching the floor at all.   The elevator got past the second floor and my little brother stepped in after I got my leg back on the elevator.   My knee was dragged between the elevator and the second floor. My mother ran over and helped me out of the building. My little brother took me back to the first floor on the elevator.   .   .   .

"Q.   Now, state whether or not you were ever paid for the afternoon for answering the telephone at the time you were hurt?   A.   Yes, sir; John Hodgson paid me a quarter.   I had answered the telephone before the 19th of August.   I answered it before when asked to by John Hodgson.   I was paid for answering it on those occasions for about three months.   I did not answer it steadily every day.   Just whenever I was called in there.   I did not know how to operate the elevator. John Hodgson told me how, not very long after he had told me to answer the telephone."

On cross-examination the plaintiff testified as follows:

"The movement of the elevator was regulated solely and entirely by these wires, to the best of my knowledge.   They were the only wires I knew of.   I operated it time and again by those two wires, and had seen other people operate it by them.   I never saw anybody operate it in any other way.   Those wires were not quite touching the wall.   When Mr. Hodgson explained to me how to operate the elevator I tried to

see if I could do it; I did it all right. I learned in a very short time how to operate it . From that time on to the time I was hurt, I operated the elevator by those wires at least one hundred times. In operating the elevator at least one hundred times I never before this time sat down on the elevator; that was the first time. In operating the elevator before, I had passed the second floor and gone up toward the third floor at times. I knew there was a crack between the south edge of the elevator and the second floor. I had seen it often as I went up by it. It was light at the time I was operating it. . . . I heard a call way down at the south end of the building; then I got on the elevator which was way up in the north end of the building, and pulled the wire and started it; I was standing up then. . . . I went up to the second floor and got almost to the third floor. I didn't see Mr. Hodgson on the third floor. There are horses and stalls all through on the second floor. They are on the side of the elevator. Closed ones are higher than me, and those open are not. Those on the side I don't think are higher than me. *I didn't go up to the third floor so I could see over the stalls. I thought he was on the third floor; he told me before he was going up to the third floor to get the sacks,* and I started up to the third floor. He went up to the third floor on the elevator. When I went up there to call him I found he was down on the ground. *I didn't know where he was. I never did find out.* My little brother called me to come down and I went through the space again between the second floor and the elevator. . . . My little brother was standing right by the elevator when he called me and told me that Hodgson had gone up to the second floor. I don't know how long it took me to find him when I started upstairs, or how long it would take to run the elevator from the ground floor almost to the third floor. When I found that Mr. Hodgson had gone up the chute to the second floor I pulled

the wire again with my leg over the bar. I knew that if·I pulled one wire that it would send the elevator up, and if I pulled the other wire it would send it down. . . . I was sitting on the elevator with my leg over the bar when I started up and the side of my leg rubbed the bar. When I got up to the second floor I stepped on the elevator, and that is the first time in over a hundred times that I operated the elevator that I had ever gone up with my leg over it. When I got up to the second floor the outside of my left knee was hurt. I had not changed my position at all. I sat right on the elevator going up. My leg just from the knee was hanging over. I don't know how it was done, but it scraped through. My knee was struck, all scraped on the outer side. I just had one leg over the elevator. My little brother stopped the elevator. I could not do anything to stop it. He just pulled the wire that stopped it. He is eleven years old in May. I don't believe I ever saw him operate the elevator before. I did not tell him how to stop it. He had seen me and all of them operate it and just picked it up and could stop it very easily. I screamed but that did not bring him up to stop the elevator, he was already at the bottom. When I was going up, he was standing at the wall, on the west side of the elevator, and when I screamed he let the elevator go past the second floor."

John Reynard testified for the plaintiff: "I am twelve years old and I live at 407 South Fifteenth street, across the street from the Wells Fargo Building. I was around that building in August, 1909, before this little girl got hurt. I remember when she got hurt. I have seen her in the office answering the telephone, about twice. I do not know exactly when it was. It was near the time she got hurt; it was before that. Mr. Hodgson was upstairs when the telephone rang and she went to the chute and called Mr. Hodgson and he came down; I do not know what he did when he came down; I left the stable. On the other time that she

answered the telephone I did not see her call any one. It was about six weeks before she got hurt that I saw her answer the telephone, when she called Mr. Hodgson."

On cross-examination, the witness testified: "The time I heard her call Mr. Hodgson was about six weeks before she got hurt, and that time she went to the chute to call him. Edna and the other children and I living there in the neighborhood used to go in the building every once in a while. I did not play around there very often. Mr. Hodgson used to tell us children to get out of there once in a while. About six weeks before Edna was hurt, when she called him, I did not wait until Mr. Hodgson got down before I went away from the building.. When I found Mr. Hodgson was going to come down I got away from the building. I had heard Mr. Hodgson tell all of us children that played together to get away from the building. I had played with Edna around the building. I had heard him tell all of us to get away from the stable very often. He had told us children about five times within a month or two before Edna got hurt to get out of the building, we might get hurt. The other time I heard Edna answer the telephone, she did not call anybody."

On re-direct examination the witness stated: "I have never heard Mr. Hodgson or anybody tell Edna to leave the building."

On re-cross examination, the witness stated: "At the time Mr. Hodgson would tell us to go out, I was not in the building. Edna was not in the building. She was never around there when Mr. Hodgson would order me to get out. I did not tell you that just now."

Nine of the employees of the defendant testified that plaintiff was told by Hodgson and McGinnis to leave the barn, some of them saying it was frequently done. Several of the plaintiff's neighbors testified to the same effect.

Hodgson testified that on one occasion he threw a quarter to some children and told them to buy a watermelon and get away from there. He denied that he ever requested plaintiff to answer the telephone or operate the elevator, but testified that he told her many times to get out of the building, and that on one or two occasions he put her out.

There are two counts in the petition. The first charges common-law negligence in employing the plaintiff, knowing that she had not sufficient age, experience, judgment and skill to run the elevator. That count contained the following:

"That on August 19, 1909, defendant's foreman, then in charge of said building for defendant, requested plaintiff to answer calls on said telephone and to notify him in case of a call on said telephone, and promised plaintiff to pay her a compensation in money if she would perform said service, whereupon plaintiff told said foreman she would perform said service and undertook at once in pursuance of said request to answer said telephone and notify said foreman of said calls, and on said day after so requesting plaintiff to answer said telephone said foreman ascended to some floor of said building above its first floor, and before so ascending informed plaintiff that he was going up in said building and directed her that in case a call should come over said telephone while he was there for her to ascend in said building and notify him of said call, and negligently directed her that in such case for her to so ascend by means of said elevator, and negligently directed her to use and operate said elevator for such purpose.

"That on August 19, 1909, after said foreman had so ascended and while he was in some part of said building above its first floor, a call came over said telephone, and plaintiff immediately in pursuance of the said request and directions of said foreman attempted to find and notify him of said call, and for

Boesel v. Wells Fargo & Co.

the purpose of finding him to so notify him, plaintiff got on said elevator and operated it so as to cause it to ascend with her thereon from said first floor.

"That on August 19, 1909, by reason of the negligence above mentioned of said foreman, while, as aforesaid, said elevator was ascending with plaintiff thereon, her left leg and knee, because of her said lack of sufficient age, experience, skill, knowledge, capacity and judgment to use or operate said elevator with reasonable safety to herself, or to perceive or understand the danger to her arising from her operating or using said elevator, were caught between said elevator while it was so ascending and the second floor of said building and thereby crushed and injured."

The second count was based on section 1723 of the Revised Statutes which forbids the employment of children under sixteen years of age "in any capacity whatever in operating or assisting to operate any passenger or freight elevator."

Upon the trial and after the close of all of the testimony in the case the court below gave to the jury at defendant's request, an instruction in the nature of a demurrer to the evidence on the second count of the petition. Thereupon plaintiff took a nonsuit as to said second count of her petition, with leave to move to set the same aside, which without success she subsequently did.

At the instance of the defendant the following instruction was given:

"The burden of proving that defendant was negligent as charged in this case, and as submitted by the instructions herein, rests upon the plaintiff, and if plaintiff has not proven by the preponderance of the evidence that defendant was negligent in the manner so stated, and that such negligence was the sole cause of plaintiff's alleged injuries, then your verdict must be for the defendant."

The above statement which but slightly and immaterially varies from that made by Roy, C., in Division Two, will, we think, be found sufficient to make clear the points discussed in the below opinion.

## OPINION.

I.  Plaintiff complains of the act of the court below in modifying an instruction offered by her, by inserting therein *sua sponte,* the words, "and that when she was injured she was exercising ordinary care as defined by other instructions," as also (and one objection is the corollary of the other) for that the court gave an instruction at defendant's request, submitting to the jury the theory of plaintiff's contributory negligence.

Contributory
Negligence:
Not Pleaded:
Instruction.

Contributory negligence was not pleaded by defendant.  To render it available as an affirmative defense, it must have been pleaded.  There is no doubt that the learned trial court fell inadvertently here into an erroneous inconsistency.  If the proof of plaintiff showed her contributory negligence to an extent barring recovery as a matter of law, then such negligence was available to defendant here even though not pleaded.  [Schlereth v. Railroad, 96 Mo. l. c. 514; Collett v. Kuhlman, 243 Mo. 585.]  In such case the defendant's demurrer to the evidence of plaintiff should have been sustained.  [White v. Railroad, 250 Mo. 476.]  A submission to the jury of the issue of plaintiff's contributory negligence when no such defense was made in the answer, was clearly erroneous and reversible error unless we can find from the whole evidence of plaintiff that she herself shows her own contributory negligence to an extent which as a matter of law forbids a judgment in her favor.  [Keitel v. Railroad, 28 Mo. App. l. c. 663; Schultze v. Railroad, 32 Mo. App. l. c. 448; State ex rel. v. Hallen, 165 Mo.

App. l. c. 438; White v. Railroad, supra; Collett v. Kuhlman, supra.] Manifestly we ought not to reverse a case if there be no case, that is, if there be no sufficient proof to make a case (Sec. 2082, R. S. 1909; Moore v. Railroad, 176 Mo. l. c. 545); even though defendant satisfied as it might well have been, with its victory below, has not appealed. [Sec. 1850, R. S. 1909; Turner v. Anderson, 236 Mo. 523.] We will next then examine whether there was sufficient evidence to make out a case for plaintiff upon the first count of her petition. We lay by for subsequent discussion alleged error in sustaining a demurrer to the evidence on the second count.

II. As a preface or foreword I may say that the case upon the whole does not impress me as having any real justice or merit in it. So I find it difficult to approach it equitably. Some such impression was lately made upon the mind of my learned associate, GRAVES, J., by the facts in the case of State v. Long, 257 Mo. 199. As the testimony impresses me, there is an almost palpable inference derivable from it that the truth lies in the view that plaintiff was hurt while engaged in meddlesome mischief solely.

**Contributory Negligence: Child: Matter of Law.**

The discussion here is touching the facts as to the common-law negligence set up in the first count on which the case was sent to the jury. The plaintiff was hurt on August 19, 1909. She was on that date fourteen years, eight and one-half months old. She says she had been operating this elevator for some three months. It was operated by two wires (wire ropes, she clearly means), one of which was pulled to ascend and the other to descend. She learned, she says, in a very short time how to operate it. "From that time on," to quote her own testimony, "to the time I was hurt I operated the elevator by those wires at least one hundred times. . . . I never before this

time sat down on the elevator; that was the first time.
. . . I knew there was a crack between the south edge
of the elevator and the second floor. I had seen it often
as I went up by it. It was light at the time I was op-
erating it.'' In her direct examination, as to the two-
inch space between the edge of the second floor and the
outer edge of the elevator, she says: ''The elevator
does not fit close against the second floor. There is a
space between them; I could not tell exactly just how
wide it was. *It looked as though it would be wide
enough for my leg to go through without hitting or
touching the floor at all.*''

The closing words of the above excerpt, which we
italicise in order to emphasize what we are next to say,
bring this case in legal effect on all-fours with the
facts in the case of Henry v. Railroad, 141 Mo. App.
351, where as the court finds and says, the fourteen-
year-old boy who was hurt knew the size of the aper-
ture through which, in revolving the turntable, his legs
must pass, and intended to draw his legs out of dan-
ger, but neglecting to do so timely, was caught and his
leg crushed. Here the plaintiff did not intend to draw
her leg out of the way, but knowing the size of the
aperture from having seen it at least—we infer from
her testimony—a hundred times, she merely relied on
her belief that her leg could safely pass through this
space and was on this account caught and hurt.

In the Henry case, supra, at page 357, Judge El-
lison who wrote the opinion of the court, said:

''The situation thus described leading plaintiff to
his injury, is one that should have reasonably been
avoided by a youth of fewer years and of immensely
less experience than he. Why he did not remain on the
ground when he quit pushing on the lever is not to be
accounted for by his youth, for such a boy as he would
know that that was the prudent and natural thing to
do, and such as he, in like situation, must be held by
the courts to know the probable consequences. Keep-

ing in mind that we are dealing with one of his age, and his experience also, yet we can conclude but one thing consistent with any degree of reason and that is that he seated himself on the table intending to draw up his legs when he got to the point of contact, and did not do it. An additional suggestion would seem to bar his recovery. Conceding his youth and lack of judgment to the full of the argument in his behalf, yet he testified that he saw his danger, but thought his legs would not be caught. Then he discovered they would be and began to draw them up, succeeding with one, while the other was caught between the ends of the table and the spur rails. We cannot understand why, if he could get one leg up into safety, he could not have gotten both, since they could have been raised at the same time, either as he sat or by throwing himself over backwards onto the table. It seems to us that the effect of plaintiff's position approaches the point of judging him as an inanimate body; or if not that extreme, as a body bereft of reason.''

Likewise in the case of McGee v. Railroad, 214 Mo. 530, a case wherein the parents of a deceased boy thirteen years old were denied recovery on the ground of the contributory negligence of the latter as a matter of law. Discussing the latter case it was said by LAMM, J., who delivered the opinion of the court:

''When an issue of fact is framed and put to a jury on the question of the negligence of a minor the general rule is to so frame the instruction as to graduate the degree of care demanded of a child to his age and capacity. That rule requires that a child should be judged as a child and not as a man. But the rule does not mean that the question is always to be submitted to a jury. Children may be declared as a matter of law *non sui juris* at certain tender years and with certain infantile judgments. Then, again, they may be declared *sui juris* as a matter of law when their age, capacity and the circumstances under which they

act are all considered. It may be taken as the most
enlightened and accepted doctrine in the case of in-
fants that generally the question of their contributory
negligence is one for the jury. But it is not the ac-
cepted doctrine that it may not under given circum-
stances be dealt with as a matter of law. If the facts
are few and simple, devoid of confusion and complica-
tions, and if the danger to be avoided is so apparent
as to be within the easy comprehension of a boy of
thirteen years of age, if that boy is shown to be of
bright intelligence and of a judgment training him to
caution and care in the matter in hand—we say all
these things being admitted, then there is no reason
why the judge on the bench may not as a matter of law
under the facts of the given case declare there could
be no two opinions among reasonable men about the
negligence of such a boy measured by the standard
of an ordinarily prudent boy. A boy of that age knows
as well as an adult that a locomotive must follow the
rails and that it cannot run around him or avoid strik-
ing him if he is on the track and gets in its way."

Here in the instant case the plaintiff knew and
fully appreciated the danger. She deliberately hung
her leg over the edge of the elevator platform and
knowingly experimented to see whether her leg could
go through the space in the elevator shaft between the
edge of the elevator platform and that of the second
floor. She thought it would safely pass, or as she ex-
presses it, "It looked as though it would be wide
enough for my leg to go through without hitting or
touching the floor at all."

If the deceased boy in the McGee case, supra, had
but lived to testify that he saw the train coming, but
believed he could beat it over the road crossing, the
latter case would be as strong a case forbidding recov-
ery as is this one. Therefore, as upon this count, the
verdict of the jury was for the right party, it makes
no difference whether the court erred or not in giving

to the jury instructions injecting into the case an issue
not pleaded. [Hurck v. Railroad, 252 Mo. 39; Trainer
v. Mining Co., 243 Mo. 359; Quinn v. Railroad, 218
Mo. 545.] We disallow this assignment of error.

III. What we have said in the preceding para-
graph applies only to the first count; that which
charges common-law negligence. Plain-
tiff contends that defendant through its
stable foreman, Hodgson, violated the
provisions of section 1723, Revised Stat-
utes 1909, then in force, but since re-
pealed by the Act of 1911. [Laws 1911, p. 132.] The
applicable part of the above section in force when the
injury happened, is thus written in the statute:

Employment
of Child:
Statutory
Negligence.

"Sec. 1723. No child under the age of sixteen
years shall be employed . . . in any capacity what-
ever in operating or assisting to operate any passen-
ger or freight elevator."

There were no provisions in the act creating any
express civil liability by reason of violation. By a sub-
sequent section the violation of the act was made a mis-
demeanor, both in the parent or guardian, who per-
mitted such child to be employed in the forbidden oc-
cupations, and in the employer who employed such
child, and fines were provided to punish both such vio-
lators.

If we shall find from the facts that the plaintiff
was employed "in operating or assisting to operate"
the freight elevator in defendant's barn then we may
inquire from the decided cases, having brought the
case within the statute, whether such act of defendant
perpetrated through its stable foreman Hodgson was
(a) negligence *per se* (Steel Car Forge Co. v. Chec,
107 C. C. A. 192; Scally v. Garratt & Co., 11 Cal. App.
138; Casperson v. Michaels, 142 Ky. 314; Hankins v.
Reimers, 86 Neb. 307; Stehle v. Automatic Machine
Co., 225 Pa. St. 348; Sharon v. Winnebago Furniture

Co., 141 Wis. 185; Kircher v. Ironclad Mfg. Co., 118 N. Y. Supp. 823); (b) whether it foreclosed to defendant ordinarily the defense of contributory negligence (there was no such plea here however), (Strafford v. Republic Iron Co., 238 Ill. 371; Marquette Coal Co. v. Dielie, 208 Ill. 116; Sullivan v. Hanover Cordage Co., 222 Pa. St. 40; Lenahan v. Pittston Coal Co., 218 Pa. St. 311; Inland Steel Co. v. Yedinak, 172 Ind. 423); or (c) whether it was merely an act of negligence in the master to go to the jury, leaving open as a defense the plea of the contributory negligence of plaintiff, if any, to be passed on by a jury. [Sterling v. Union Carbide Co., 142 Mich. 284; Woolf v. Nauman Co., 128 Iowa, 261; Smith v. National Coal Co., 135 Ky. 671; Bromberg v. Evans Laundry Co., 134 Iowa, 38; Perry v. Tozer, 90 Minn. 431; Rahn v. Standard Optical Co., 96 N. Y. Supp. 1080; Lee v. Sterling Silk Co., 118 N. Y. Supp. 852; Berdos v. Mills, 209 Mass. 489; Woods v. Paper Co., 167 Mich. 514.]

If it was negligence *per se;* if it foreclosed the defense of contributory negligence, or if it was evidence of common-law negligence, it was error to sustain the demurrer of defendant to the second count of plaintiff's petition, provided the facts of the alleged employment as shown by the testimony of plaintiff bring the defendant within the letter of the statute.

But a serious question *in limine* thrusts itself into the case here, that is: Was there causal connection between plaintiff's employment to answer the telephone, and the identical use of the elevator therein, so as to enable us to say *she was employed to operate the freight elevator* within the purview of this statute? We think not. This is a penal statute; penal as to the parents of plaintiff as well as to Hodgson and the defendant. It is fundamental that penal statutes are to be strictly construed. If Hodgson, or the defendant, or the mother of the minor plaintiff had been prosecuted for the forbidden misdemeanor of employ-

ing the plaintiff to operate a freight elevator, could a conviction be sustained against either one of the three upon the testimony in this record? Did either one or all three of these persons violate this penal statute as to any employment of this girl? If they did not how can this case fall within the purview of section 1723? Is it not a condition precedent to any actionable liability under this section that there must first be a violation thereof? There is not a word in it as to its violation producing any liability other than the criminal one; if there were, then the civil liability might be independent and not interdependent. If there is a civil liability therefore such must arise from an antecedent criminal infraction. It is criminal liability plus civil liability and by its terms in reason cannot be civil liability minus criminal liability. The civil liability is built upon the misdemeanor in the case and which is denounced in the statute, as upon a rock. Not of course in the sense that a conviction must first be had, but in the sense that if the facts in the case fall short of being sufficient to make out any criminal liability, they likewise ought to be insufficient to make out any civil liability.

In the case of Fortier v. The Fair, 153 Ill. App. 200, it was held that the fact that a child under sixteen years of age was required in the course of his employment to ride up and down upon an elevator once or twice a day could not be deemed necessarily and as a matter of law to constitute it an employment dangerous to life and limb within the meaning of a statute prohibiting such employment.

While it is true that the holdings are pretty unanimous that if a child within a prohibited age be employed in a forbidden work, the unlawful employment is to be regarded in law as the proximate cause of the injury (Sharon v. Winnebago Furniture Co., supra; Casteel v. Brick Co., 83 Kan. 533), and that the finding

260 Mo.—31

of such unlawful employment establishes the neces-
sary causal relation between the disobedience to the
statute and plaintiff's injury, even though when in-
jured plaintiff was not presently engaged in the duties
of the forbidden employment. But in the instant case
the employment (granting as we do grudgingly but
as in law we must, that any such existed) to answer the
telephone was not unlawful. If plaintiff had been em-
ployed to operate the elevator, and had been hurt while
answering the telephone, the causal relation of the
cases last supra, would then have been present, ac-
cording to these cases. These latter cases, however,
are the very converse of the instant case; they are so
held and also they hold that a contrary state of facts
would not produce civil liability. [Casperson v.
Michaels, 142 Ky. 314; Unnewehr Co. v. Standard Ins.
Co., 99 C. C. A. 490; Steel Car Forge Co. v. Chec, 107
C. C. A. 192; Norman v. Coal Co., 68 W. Va. 1. c. 409;
Revis v. Railroad, 147 Ill. App. 116.]

In the Casperson case, supra, at page 317, it was
said:

"It is argued that appellant had the right to em-
ploy appellee in the laundry, just so she was not put to
work at any of the machinery therein used; that as she
was injured at a part of the machinery where she
was not employed to work, and at a time when she
was not actually engaged in work, the case is just the
same as if she had been employed to mark towels, an
employment attended by no danger, and had gone into
the machinery room and been injured in the same man-
ner; that if that be true her right to recover does not
depend upon the statute and her case should be con-
sidered from a standpoint entirely independent of the
statute; and when so considered, her own evidence
shows that the danger of placing her hand on or near
the drum was so obvious and apparent that even a
child of much tenderer years ought to have known and
appreciated the danger. While we appreciate fully the

force of appellant's contention, we think the difference between the supposed case and that at bar consists in this: In the supposed case there would be no violation of the statute, and therefore, no right of action could be predicated on the statute; in the case at bar, however, appellee was employed and put to work at the mangle in violation of the statute. She was actually injured by the mangle at which she had been put to work.''

The discussion of this matter of causal connection for damages arising from the alleged violation of a penal statute is likewise ably handled in the case of Norman v. Coal Co., supra, at pages 408 and 409, where it was said:

"The true question to be determined in an action based upon a failure to obey a statute like the one under consideration is: Did the unlawful employment cause the injury? The trial of the case must be guided by this question. If the injury complained of is a natural and probable consequence of a violation of the statute, then that violation is correctly taken as the proximate cause of the injury. If the very injury has happened which was intended to be prevented by the statute law, that injury must be considered as directly caused by the non-observance of the law. But if the injury is one that happened by causes independent of the violation of the statute, it is not actionable on the basis of that violation. If an intervening event against which the statute evidently did not intend to provide, and the appearance of which was not anticipated by the spirit and purpose of the act, has in fact caused the injury, that event is plainly the proximate cause.''

We conclude that the learned court nisi did not err in sustaining the demurrer of defendant to the evidence adduced on the second count, by reason of the fact that such evidence did not show a causal connection under the terms of a penal statute for the injury of plaintiff. We need not therefore, this view

considered, determine whether a violation of such a statute as that under discussion is negligence *per se* or whether the violation thereof forecloses the defensive plea of contributory negligence or not, leaving all such points open for discussion when they shall become live ones.

IV.  Having reached the conclusion noted in paragraphs II and III, supra, other errors strenuously contended for become immaterial and wholly indecisive of this case.  For example, plaintiff contends that the admission of evidence that defendant had notified the mother of plaintiff to keep her away from the stable of defendant, was error; for that plaintiff at her own suit, is not bound by the negligence of her mother.  We concede the rule of law contended for by plaintiff in a proper case, but are not able to see its applicability to the facts here.  At least one-half of the negligence here complained of is the alleged employment of plaintiff by defendant in a forbidden capacity.  The mere request made to the mother of plaintiff to keep her away from the stable is adventitious and in no way touches or materially affects the latter phase of the case.  If this had been a turntable case or a case wherein the mother of plaintiff had been asked to keep the injured child away from a dangerous but alluring instrumentality, negligently maintained by defendant, some basis might exist for the contention of plaintiff.  But here one phase of the case, that of liability bottomed on the violation of a penal statute, connotes as an element, the permission of the person in control of the child.

Other contentions made are fully disposed of by what we say above.  It results that in our view the judgment here was for the right party and ought to be affirmed.  Let this be done.

*Lamm, C. J., Graves, Bond* and *Walker, JJ.,* concur; *Woodson, J.,* concurs in separate opinion; *Brown, J.,* dissents.

## CONCURRING OPINION.

WOODSON, J.—I concur in the result reached in the majority opinion in this case, but am unable to agree in the construction placed upon section 1723, Revised Statutes 1909, which provides that "no child under the age of sixteen years shall be employed . . . in any capacity whatever in operating or assisting to operate any passenger or freight elevator." I believe this statute says what it means, and means what it says; and being constitutional under the repeated rulings of this, and various other courts of last resort throughout the Union involving similar statutes, the defendant had no legal right to employ the plaintiff, in any capacity to operate or to assist in the operation of the elevator mentioned. If that was all there was to this case, I would be in favor of a reversal.

Because of the individual hardship flowing from this class of legislation, *in particular cases,* this and other courts have departed from the letter, and even the spirit of this class of legislation, thereby hoping to do justice in the *particular case,* not foreseeing the great injustice and complications that would naturally arise by such unwise departure. For instance, in the case of Morgan v. Railroad, 159 Mo. 262, under the plea of natural justice, section 2611, Revised Statutes 1889, and similar statutes in other states regarding trespassers upon railroads, designed to protect life and limb by prohibiting every one, except the employees of the company, from being upon, or walking along the tracks of the railroad company, was practically repealed, because of the strong desire upon the part of this and other courts to measure out justice in an individual case, which was done at the great

cost of the repeal of that humane statute intended to protect all from personal injuries, as well as to give the trains of the company a *clear and free right of way over their own tracks,* and not to be hindered and delayed by trespassers, or other persons who had no more legal right to be there, than a burglar has in my house, and from this breaking down of that statute, the last-chance rule or the so-called humanitarian doctrine as understood in this State, sprang into existence, as naturally as day follows night, and thereby converted a wise statute, for the protection of all, into inextricable chaos, and turning the citizens of the country loose upon the various railroads thereof, without a light or compass, believing as they did and do under the ruling of that and similar cases, that they have equal rights upon a railroad with the engines and cars of the company, which of course is erroneous, and causes a continuous conflict and war between them and the railroads.

In my opinion, that ruling either directly or indirectly has caused more bloodshed and waste of treasure, than has any one war on the face of the earth from that date to this.

In the case of Murphy v. Railroad, 228 Mo. 56, beginning at page 88, with the meager information I could glean from observation, the press, the State and Federal labor bureaus, and State and Interstate railway and commerce reports, I pointed out in a limited way the appalling loss of life and limb, and the loss and destruction done to property, that naturally flowed from that unwise, yet intended humane ruling. I believe I may speak with authority when I say that in my opinion, both the bench and bar now see the error of that ruling and deeply regret the doctrine which so spontaneously mounted therefrom—as the Phoenix arose from its own ashes, with such youth and vigor—never dreamed of when the doctrine was first announced. That case vividly illustrates the old saying

"Hard cases make bad laws;" and that said truth has never before been so forcibly impressed upon the minds of thinking men, within the annals of our jurisprudence.

The effect of that ruling had the direct and opposite effect to what all at the time thought it would have, and I confess that at the time I entertained the same views of the statute that were announced by this court in that case; however, since investigating the matter, I have completely changed my views thereof, not of the merits of the particular case, but of the rule announced. And I realize the rule as there announced, in that case, cannot and probably should not be changed except by legislation; but this court being perfectly familiar with the evils that have flowed and are constantly flowing from that rule, should set its face like a flint against its further extension, or to corrupt any other helpful statute by injecting into its meaning the virus of that unwise ruling. Believing as I do, that the elevator statute under consideration says what it means, and means what it says, namely, that no child under the age of sixteen years shall be permitted to operate or to assist in the operation of any elevator, etc., I am unwilling to lend my assistance to the infusion of the poisonous doctrine announced in the Morgan case, supra, into the arterial system of this or any other kindred statute.

But independent of this, I do not believe under all of the evidence preserved in this record, the plaintiff, under the modern rule of evidence, made out a case for the jury. That is, the evidence, taken as a whole, is not sufficient to justify any court or jury in holding the defendant liable for the injuries complained of in this case.

Under the old *scintilla* rule of evidence, a case may have been made for the jury, but this and most of the courts of last resort, of the various States of the United States, have abandoned that rule, and adopted

the rule of the Supreme Court of the United States, which I believe is the wiser and more just of the two, namely, that a case should not be submitted to the jury or a verdict or a judgment be permitted to stand, unless from a review of the entire record the court can say that the evidence introduced satisfies a disinterested, unbiased and reasonable man that the plaintiff should recover, or that reasonable men, under the same or similar facts or circumstances might differ, as to the facts involved.

This rule smacks of justice, and excludes the idea that any witness, however dishonest or disreputable he may be or however mistaken or ignorant he may have been of the facts, can by his bare statement deprive a person of his life, liberty or property, and compel those who come into court asking justice to produce substantial evidence tending to show to reasonable men that his demand is just and reasonable, and not founded simply upon the rule of scintilla of evidence, true or false, just or unjust, which has too frequently, under the guise of the law, robbed men and women of their lives, liberty or property. This is one of the rules of progression I most heartily concur in, to say nothing of others.

Returning to the case in hand: After a careful reading of this record, I dare say that there is not one man in a hundred who, after dispassionately reading this record, would for a moment, give any credence whatever to the unnatural, unreasonable and increditable story told by the plaintiff in this case, if weighed under the rule previously mentioned. Common observation, experience and knowledge of such matters point in no uncertain terms to the correctness of defendant's theory of this case, and to the fallacy of that of plaintiff; and according to the Hornbooks we have the legal right to resort to common sense, common observation, common experience, and common knowledge in weighing the testimony of any and all witnesses introduced.

State ex rel. v. K. C. Terminal Ry. Co.

Primarily of course, that duty rests with the jury, but if, as previously stated from an examination of the entire record, the evidence under the rule just stated is insufficient to convince one or more reasonable men of the justness of the claim presented, then neither this nor any other court should hesitate to declare the law to be that plaintiff is not entitled to a recovery.

This case in my opinion, as illuminated by the evidence, does not measure up to the rule stated, and for that reason I am firmly of the opinion that the plaintiff is not entitled to a recovery, upon the merits of the case.

So believing, I concur in the result of the majority opinion affirming the judgment of the circuit court.