Leon CATHEY, by Nellie D. Brown, his Guardian, Appellant,

v.

Walter DE WEESE and Nelson Tripp, Respondents.

No. 45055.

Supreme Court of Missouri.
Division No. 2.

March 12, 1956.

Rehearing Denied April 9, 1956.

C. B. Burns, Brookfield, R. B. Taylor, Chillicothe, C. B. Burns, Jr., Brookfield, for appellant.

Harry L. Porter, Marceline, Don Chapman, Chillicothe, for respondents.

BARRETT, Commissioner.

In this action against his employers for damages for the loss of his left leg while operating a hay baler, a jury returned a verdict of $15,000 in favor of Leon Cathey, a farm hand then seventeen years and five months old. But the trial court sustained the defendants' motion for judgment notwithstanding the verdict and Leon, by his grandmother as guardian, prosecutes this appeal from the final judgment in favor of the defendants. Thus the question upon the entire transcript is whether, viewing the evidence favorably to Leon, reasonable minds could differ in the drawing of inferences as to the defendants' negligence or as to Leon's contributory negligence and whether he assumed the risk of injury. Wilson v. White, Mo.App., 272 S.W.2d 1, 7; Crandall v. McGilvray, Mo., 270 S.W.2d 793, 798. In so viewing the evidence favorably to Leon it must be borne in mind that the trial court in ruling upon the motion was not at liberty to draw inferences of fact favorably to the defendants "to countervail either presumptions of law or inferences of fact in favor of the plaintiff." Evans v. General Explosives Co., 293 Mo. 364, 375, 239 S.W. 487, 491.

The background of this litigation is that Mr. DeWeese and his son-in-law, Nelson Tripp, were engaged in the business of farming about 1,200 acres of land in Linn and Chariton counties on the crop-share basis, and in crop season employed two or three farm hands. The latter part of

March 1952 they employed Leon, at a wage of thirty dollars a week plus room and board, to do general farm work. He had worked on farms intermittently since he was thirteen and in 1952 quit school after finishing the ninth grade and started to work for the defendants, apparently on a rather permanent basis. Before he started operating the hay baler he had done some "plowing, disking or spreading fertilizer, any number of things that go along with general farm work." He had driven trucks and operated tractors but he had not previously operated a "power take-off" tractor-drawn hay baler. The baler upon which he was injured was a "power take-off" tractor-drawn Allis Chalmers roll type baler about one year old. Photographs and descriptions of similar type machines involving somewhat comparable mishaps and injuries to adult employees will be found in Allis Chalmers Mfg. Co. v. Wichman, 8 Cir., 220 F.2d 426 and Yaun v. Allis-Chalmers Mfg. Co., 253 Wis. 558, 34 N.W.2d 853.

At the start of the haying season, about the first of June and three weeks prior to his injury, the son-in-law, Tripp, undertook to instruct Leon how to operate the baler, "he stayed with me for a while to show me the best he could how to operate it." The extent of Tripp's knowledge and expertness does not appear but the instruction consisted in Tripp's making "three or four rounds around the field," Leon riding the tractor with him and observing. Then Tripp rode for three or four rounds with Leon operating the tractor and baler. In giving specific instructions Tripp said, "Well, on learning to operate it he said the best way to learn the same way he did would be to operate it and, if something happened look around for what was wrong and try to fix it if you could and if it was something you couldn't fix, why, to get hold of him." As to whether there were any further specific instructions Leon said, "Well, I don't remember whether he ever named any specific thing or not, parts of the baler, but he told me how if it got balled up, hay got balled up to reverse the machine, run it back out, or it got to sticking in it, something like that, and, of course, he showed me how to string the string and how to put the ball of twine in, tie it on properly so it wouldn't catch or something like that." Tripp, in describing Leon's learning how to operate the baler, said, "Yes, I explained it to him. Well, in fact, he rode around with me and I explained as we went along. I drove slow the first round or two and I explained the operation, what happened, how to stop it. After we made a couple of rounds or so like that he took it and drove it and he drove slow and I rode with him and he seemed to understand, to catch on pretty quick how it worked." Thus Leon had his first instruction and learned to operate the "power take-off" hay baler.

For the greater part of the next three weeks, but not continuously, Leon operated the hay baler unassisted. He encountered, however, numerous vexing difficulties. He said, "Well, sir, I was off and on it all the time, biggest part of the time for various things, like the string breaking, and, oh, not *tieing* the bale or sticking, just kicking the hay out without tieing it or folding it into the bale." But, whatever the difficulty, "I would fix it if I could if nothing too big," and if he couldn't fix it himself he waited until Mr. Tripp got there. Beneath the tie arm there was a flat metal strip which operated as a stop for the forward movement of the arm. The stop broke or failed to function and Mr. Tripp made a new stop from a flat piece of iron and repaired the functioning of the tie arm but that was not the cause of Leon's injuries and, according to the defendants, there was no mechanical defect in the baler. Mr. DeWeese, in describing the difficulties encountered in operating the baler, said that it had given no trouble "so far as workmanship. There is always things you encounter with this type baler that can cause some trouble which doesn't necessarily mean that there is anything mechanically wrong. A windrow scattered or one too closely raked together, for some reason or other your string fails to catch in the bale, won't properly function. There is a lot of things can happen that will seem you are having a good deal of trouble on certain days, yet, mechanically there is nothing wrong with the baler particularly." Tripp

said, "It was in good condition. I run it that morning over in there and I was having I expect about the same trouble he was. The hay was thin in places, thick in others, damp, rolled up there, be heavy on one side and you get a one sided bale but big. Well, that would cause you a little trouble, wouldn't be enough hay there to catch your string and wind blowing. Just mostly hay conditions was about all the trouble."

On the morning of June twenty-fifth Leon said that he started in the field just across the road from the house "and the hay rather soggy and wet, weedy and I was off of the baler more than on, stopped about all the time, and I told Mr. DeWeese and he told me, I believe it was after dinner, I went over in the other field but he said to take it in the other field (because the hay was lighter) and to get along as best I could because he wanted to get that done." But over in this field "it kept up various things it had been doing in the other field, and, of course, I got along the best I could and then kept repairing small things that would happen *and then* (about three o'clock in the afternoon) *the tie arm,* that's the name I gave it, I don't know what the real name is, *came down* and it was supposed to kick out the bale whenever it come down, cut the string and kick the bale out *but something must have happened because it came down and I put the string in all right but still wouldn't go back up, the arm wouldn't.*" In this condition the tie arm would not operate and, since there was a full bale of hay in the machine, the canvas elevator ceased to function but the rollers continued to operate. Leon left the "power take-off" in gear, went around to the side of the machine and pushed on the tie arm with his hands, "thought maybe it was just temporarily froze there and that didn't do much good." That morning, another employee working in the same field but some distance away, said that on one occasion he saw Leon and "As he stopped the tractor he took off his cap and slapped it against his leg and jumped off and as he went around the baler he kicked it, he was in a bad mood.") But, being unable to loosen the tie arm with his hands, he climbed up on the machine and stood upon the platform at the top and "tried to disengage it with my foot and that was when my foot (the left foot) slipped off the arm and was caught in the roller." Of course, the force of the rollers pulled his leg into the machine above the knee, necessitating the amputation of his leg at mid-thigh.

There is no dispute between the parties as to the general rules applicable to minors and their employers. The cases have been carefully collected and the general rules set forth in Wilson v. White, Mo.App., 272 S.W.2d 1 and the annotations in 107 A.L.R. 4 and 174 A.L.R. 1080. It is not necessary to again collect the cases and restate the general rules, it is sufficient to note that the cases are in irreconcilable conflict. For example, in 1913 the court en banc, in Jackson v. Butler, 249 Mo. 342, 155 S.W. 1071, held that an employer's negligence in furnishing a reasonably safe place to work when stacked, leaning lockers fell and injured a boy seventeen to eighteen years old and whether the plaintiff was to be judged as a boy "or as a man full-grown" and therefore guilty of contributory negligence were all questions for the jury's determination. One year later, without change in personnel and with the same judge writing both opinions, the court en banc, in Boesel v. Wells Fargo & Co., 260 Mo. 463, 169 S.W. 110, declared as a matter of law that a girl, aged fourteen years eight and one half months was guilty of contributory negligence in operating her employer's elevator from a sitting position with one leg hanging over the side of the elevator. The prior decision of Jackson v. Butler was not cited in the opinion. Another decision of doubtful value as a precedent is Berry v. Majestic Milling Co., 304 Mo. 292, 263 S.W. 406. There a boy fifteen employed to "make meal" had a part of his hand cut off by a roller when he reached into a chute to feel the texture of the meal. In a divisional opinion, written by a commissioner, the court first held that a previous appeal was res adjudicata. Nevertheless, the court then held that in testing the texture of the meal the boy was not doing an act for his employer or within the scope of his employment and, furthermore, that the boy was guilty of contribu-

tory negligence as a matter of law. Two judges concurred in the opinion, one judge concurred "in paragraph 2 and the result," and the fourth judge concurred in the result. In justification of these cases, it can be pointed out, as is the fact with this case, that they did all differ and were distinguishable upon their particular facts, and as the court emphasized in Jackson v. Butler [249 Mo. 342, 155 S.W. 1079], "Each set of facts stand, in a sense, upon their own bottom, and are to be judged by common sense—of the variety sometimes called in the vernacular 'horse sense.' "

In this connection there is one further matter to be noted, the respondents contend not only that Leon was guilty of contributory negligence as a matter of law but that he "assumed the risk incident to the operation of the hay baler." In so contending the respondents fail to carefully note the precise distinctions between contributory negligence and assumption of risk, the fact that contributory negligence is a matter of conduct while assumption of risk is based upon express or implied assent. Annotation 107 A.L.R., loc. cit. 5-6; 35 Am.Jur., Secs. 243, 295, 301. Basically, the argument here is that Leon was warned, knew of the danger, and therefore assumed the risk and was guilty of contributory negligence. So considered, the distinctions may belong in the realm of theory rather than of fact (35 Am.Jur., Sec. 296) and so the issues overlap and the determination of one issue upon this appeal is determinative of the other. Prosser, Torts, p. 304; 56 C.J.S., Master and Servant, § 415, p. 1240.

As urged, for his years, Leon was an experienced general farm hand, but certainly reasonable minds would differ as to whether three weeks' rather unsuccessful use after a few "rounds" of instruction constituted "experience", Stanley v. Chicago, M. & St. P. R. Co., 112 Mo.App. 601, 87 S.W. 112, in the operation of this rather recent and complicated device. From the fact that his employers admittedly deemed some instruction necessary before entrusting him with the baler at all, it is indeed a fair and reasonable inference that he had not had previous experience in the operation of this type of hay baler. It is obvious from the record that Leon was a boy of average intelligence with such formal learning as a ninth grade education provides. But even a resourceful seventeen year old boy with a ninth grade education is not to be generally adjudged by the standards of care applicable to an adult, after a mere three weeks' use of complicated modern farm machinery. Smiley v. Jessup, Mo. App., 282 S.W. 110; Bulson v. International Shoe Co., 191 Mo.App., 128, 177 S.W. 1084; Benjamin v. C. Hager & Sons Hinge Mfg. Co., Mo.App., 273 S.W. 754. There is no specific evidence as to his "capacity" with respect to this particular machine except as the fact may be inferred from his description of his success in its use and the fact, as his employer said, "he seemed to understand, to catch on pretty quick how it worked." Stanley v. Chicago, M. & St. P. R. Co., supra, annotation 174 A.L.R., loc. cit. 1097 and "The Standard of Care Required of Children," 37 Yale L.J. 618.

As to whether the defendants had given "any instructions concerning the danger" (to use defense counsel's language) in operating the baler Leon said, "Well, I am not real sure what they did say now but I know they showed me the different ways to put the string in as I stated before and various ways to operate or to fix something that happened, small things usually would happen quite a little bit." As to whether they had told him "never to get on the baler while the power take-off was in gear," he said, "Well, I can't positively state they did because I don't remember whether they did or not." Mr. DeWeese testified that he gave Leon this warning, "Well, *I told Leon repeatedly whatever he did to be careful in operating the baler* and above all whatever he did if he had to do anything to the baler to be sure and shut off his power take-off. I also told Leon there was always times that any type of machinery was liable to give trouble and particularly with the roll type baler, there was so many different things that could enter into it to cause trouble and *above all never to get on the baler unless he had the power take-off*

*disengaged."* Mr. Tripp said, "I gave, in fact, a number of times cautioned him about not getting on the baler while it was in motion, while the power take-off was in gear. In fact, I wouldn't even get off of the tractor without shutting off the power take-off because you couldn't do any work on it while it was running." It was Leon's position, repeatedly asserted, that the respondents had told him to fix or repair anything that might go wrong with the baler and "sometimes you couldn't find out all of what was wrong with it without them (the rollers) turning." On this occasion he knew the tie arm was stuck but "I didn't know what was wrong. I had gone back to look and see." It is evident from Mr. De-Weese's statement that Leon was expected to fix whatever went awry, if he could, and it was even contemplated that it might become necessary for him "to get on the baler," the admonition was to not get on it with the power take-off in gear. In this situation Leon was confronted with a dilemma, and, being expected to repair the difficulty, the question arises at once whether there was a reasonable alternative, certainly when considering whether he assumed the risk. Prosser, Torts, p. 313. But if one is to be technical the respondents' claim that they had warned Leon could be accepted and the question of the adequacy of the warning would remain. Was the admonition "to be careful," to not get on the baler "unless he had the power take-off disengaged" a sufficient, adequate warning in view of what was expected of him, and in view of the specific difficulty to be solved and particularly in view of the circumstances and the particular thing that resulted in his injury? Or, were the admonitions of any greater force than mere "general warnings" to be careful? Ludwig v. H. D. Williams Cooperage Co., 156 Mo. App. 117, 136 S.W. 749. In Bulson v. International Shoe Co., the court, in speaking of a general warning, said, 191 Mo.App. 128, 177 S.W. loc. cit. 1086, "with respect to a minor, the duty (the duty a master owes his servant) must take into account the further fact of minority, with its usual concomitants of immature judgment and care, and the master must give such instructions and warnings as are reasonably required to obviate the risks born of such immaturity." The court quoted this statement from a leading text: " 'It is not enough that he should do his best to make the servant understand; he must actually understand and appreciate the danger.' "

■ There was a printed warning sign near the top of the machine: "Warning. Never step on the conveyor platform of the power take off without putting it out of gear." Leon had seen the warning sign but "it was faded out and dirty" and he had not read it, "it wasn't too plain." But, without having read the sign, Leon said that he knew it was dangerous to come in contact with the rollers. "Q. Leon, you knew it was dangerous to be operating on this machine and trying to fix it as long as the rollers were turning? A. Yes, sir, in some respects but sometimes you couldn't find out all of what was wrong with it without them turning. Q. Sometimes you couldn't find out what was wrong with it without them turning? A. That's right. Q. That was the reason you were willing to assume whatever danger was involved in order to find out what was wrong? A. That's right, sir." So Leon knew that there was danger in his mounting the machine with the power take-off in gear and attempting to disengage the tie arm with his foot or in attempting to unclog the machine but it does not follow from that knowledge alone that the trial court properly declared that he was guilty of contributory negligence or that he had assumed the risk and as a matter of law could not recover in this action. It is not enough that a boy may have been warned, or that the danger was visible, or that he had some knowledge of the hazard, the question is whether, by reason of his youthfulness and inexperience, reasonable minds could differ as to his realization and appreciation of the danger. Smiley v. Jessup, supra; Benjamin v. C. Hager & Sons Hinge Mfg. Co., supra; Ludwig v. H. D. Williams Cooperage Co., supra; Wilson v. White, supra; Carter v. Baldwin, 107 Mo. App. 217, 81 S.W. 204. Leon's awareness of some danger is not conclusive evidence of contributory negligence, Rupp v. Chica-

go, B. & Q. R. Co., Mo.App., 234 S.W. 1050, 1054 and his testimony that he knew it was dangerous to come in contact with the rollers is not an admission that he *appreciated* the hazard. Benjamin v. C. Hager & Sons Hinge Mfg. Co., Mo.App., 273 S.W. loc. cit. 757; Carter v. Baldwin, supra. Not only must the minor employee have had knowledge of the danger, it is essential that he must have *appreciated* the hazard before it can confidently be said that there could be no reasonable difference of opinion as to the rashness and imprudence of his conduct. As the court said of the seventeen year old boy injured on a cotton spin-dryer in Evans v. General Explosives Co., 293 Mo. 364, 375–376, 239 S.W. 487, 491, "although the danger in operating machinery may be visible, if by reason of the youth and inexperience of the operator he does not realize, or, in other words, is not aware of the danger to which he is exposed, it is the duty of the employer to warn him of his peril." Or as it was stated in the leading case of Burger v. Missouri Pac. Ry. Co., 112 Mo. 238, 249–250, 20 S.W. 439, 441, "In the conduct of a boy, we expect to find impulsiveness, indiscretion, and disregard of danger, and his capacity is measured accordingly. A boy may have all the knowledge of an adult respecting the dangers which will attend a particular act, but at the same time he may not have the prudence, thoughtfulness, and discertion to avoid them which are possessed by the ordinarily prudent adult person." In all the circumstances reasonable minds could well differ as to Leon's comprehension, realization, or appreciation of the hazards to which he was exposed and the adequacy of his employers' instructions and warning, and his contributory negligence and his employers' liability were not plainly determinable as a matter of law. Jackson v. Butler, supra; Evans v. General Explosives Co., supra; Smiley v. Jessup, supra; Bulson v. International Shoe Co., supra; Benjamin v. C. Hager & Sons Hinge Mfg. Co., supra; Carter v. Baldwin, supra; Ludwig v. H. D. Williams Cooperage Co., supra, and Zimmerman v. Pryor, Mo.App., 190 S.W. 26, all cases involving boys seventeen, eighteen and nineteen years of age.

In accordance with these views, the judgment is reversed and the cause remanded with directions to reinstate the verdict of the jury and enter judgment in favor of the plaintiff.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.