Elbert BAYNE et al.,
Plaintiffs-Respondents,

v.

W. K. JENKINS, Defendant-Appellant.

No. 61295.

Supreme Court of Missouri,
En Banc.

Jan. 15, 1980.

Rehearing Denied Jan. 15, 1980.

**520**

Landon H. Rowland, Roy C. Bash, Bruce G. Heavner, Kansas City, for defendant-appellant.

Jim Tom Reid, Kansas City, for plaintiffs-respondents.

SEILER, Judge.

This is an appeal in consolidated actions by seven husband-and-wife plaintiffs for sums due on their respective promissory notes given by defendant in connection with a sale of securities. Defendant admitted execution of the notes but asserted affirmative defenses under the Missouri Uniform Securities Act, §§ 409.101 et seq., RSMo 1978, and counterclaimed for damages on the ground of fraud. The jury returned its verdict for the defendant on plaintiffs' notes and also on his counterclaim for the $140,000 in cash which he had paid plaintiffs pursuant to the disputed contract of sale of the securities. The trial court, however, entered judgments for plaintiffs totaling $360,000 on the promissory notes and against defendant on his counterclaims notwithstanding the verdicts. On appeal, the court of appeals affirmed. We sustained defendant's motion to transfer because of the general interest and importance of the corporate and securities questions presented and we will treat the case as though here on original appeal. Mo. Const. art. V, § 10.

I

Defendant (hereinafter "appellant") makes various contentions on appeal, but we must first address whether the trial court erred in setting aside the jury verdicts and entering judgment for plaintiffs (hereinafter "respondents"). On this question appellant, of course, is entitled to the evidence and inferences favorable to his verdicts, *McAlister v. Urhahn*, 492 S.W.2d 19, 20 (Mo.App.1973). We, therefore, will consider the evidence and reasonable inferences favorable to the jury's verdicts and disregard respondents' evidence except insofar as it supports the verdicts. *Gregory v. Robinson*, 338 S.W.2d 88 (Mo. banc 1960); *Cathey v. DeWeese*, 289 S.W.2d 51 (Mo. 1956). As to the promissory notes, appellant asserted affirmative defenses under the securities law based on respondents

making untrue statements of material facts or omitting to state material facts necessary to make the statements not misleading. As to the counterclaims, appellant based these on various fraudulent misrepresentations as to the losses of Clark Manufacturing Company ("CMC") subsidiaries, the financial condition of CMC parent company and the value and annual rainfall on a certain Mexican ranch.

With this broad sketch of appellant's claims, we have examined the record in detail and the jury reasonably could have found the following therefrom:

Clark Manufacturing Company was organized as a partnership in 1937 by respondents Otho Clark and Ocie Hughes. Over the years, the other male respondents joined the partnership. In 1963, CMC was incorporated and all of the former partners served on the company's board of directors until the company merged with Oil and Properties, Inc. ("O&P") in 1970, with CMC as the surviving corporation, and "went public" with more than 500 shareholders. Appellant Jenkins was a shareholder of O&P at the time the merger with CMC was proposed.

Appellant is a farmer, age 52 at time of trial, with a high school education and no training in accounting, bookkeeping or securities analysis, although he owned controlling interest in a bank in Ft. Scott, Kansas, however, before the circumstances giving rise to this suit. During the time relevant to this suit, he and his family were personally engaged in farming approximately 7,900 acres in Missouri and Kansas. Appellant's first experience in the purchase of corporate stock was in 1969. One of his first acquisitions was O&P stock. Appellant voted against the merger with CMC at the O&P shareholders' meeting and thereafter filed suit to enforce his appraisal rights. Appellant was represented in the appraisal action negotiations for settlement by one Harold Kyser, of Butler, Missouri, an attorney who had previously assisted appellant in purchasing several parcels of farm land and was compensated on a transaction basis.

In connection with the negotiations for the appraisal settlement, appellant was invited by the CMC directors to and did visit an 80,000 acre Mexican ranch previously owned by O&P and then owned by CMC. Appellant was furnished with materials describing the ranch, its annual rainfall, and its economic potential which were prepared by the CMC board of directors for the 1971 annual CMC shareholders' meeting. There was a proposal that appellant would manage the Mexican ranch as part of a settlement of his appraisal action. After seeing the ranch and discussing its potential with his son, who had a degree in agronomy, appellant attempted to purchase the ranch rather than agree to manage it for CMC. Further negotiations resulted in a settlement agreement in October of 1971, whereby appellant became a CMC shareholder owning six percent of the CMC common stock. Otho Clark, then CMC president and chairman of the board, had participated in negotiations for settlement of appellant's suit. Clark was impressed with attorney Kyser's performance in the negotiations on behalf of appellant.

At this same time, Clark was having difficulty retaining control of CMC decision-making. After the merger, the board of directors had been reduced from seven to five members, with two seats going to former directors of O&P. Clark later would testify that the merger was the worst thing that happened to CMC, in that the subsidiaries acquired began to break the company financially. Shortly after the merger, an effort had been made by the former O&P directors to remove Clark from the board of directors. Clark approached Kyser, met with him alone and then later with other directors, and decided to put Kyser on the CMC board of directors in an effort to regain control of CMC. Before the February 1972 shareholders' meeting, both factions within CMC attempted to get appellant's votes for their slate of candidates on the CMC board of directors. Appellant voted for the Clark-Kyser slate, which was elected, and Kyser became the only director paid for his services, at a rate of $200 per

week for his consultation with Clark and other members of the board.

At the time of the February 1972 CMC shareholders' meeting, the corporation was engaged in the manufacture of small farm machinery. Wholly owned subsidiaries, acquired in the merger with O&P, included a truck line and a 1,000 acre cotton farm in California. Other assets included the Mexican ranch and a new venture, Clark-Bilt Homes, a subsidiary which manufactured modular homes. A packet of information and a letter from the board of directors was mailed out to CMC shareholders in connection with the February 3, 1972 shareholders' meeting. Appellant testified at trial that he relied upon the letter to shareholders and financial statements in this information packet in the purchase of respondents' securities a little more than a month following the shareholders' meeting.

Several weeks after Kyser had been elected to the CMC board and after many of the former CMC partners had concluded that their attempt to regain control had failed, Russell Beebe, a CMC director, a former CMC partner, and a Clark ally, approached Kyser about the possibility of selling the interests of the seven former partners for $500,000. Kyser next contacted Jenkins and asked him if he were still interested in buying the Mexican ranch. Kyser told appellant that the best way to acquire the ranch would be through acquiring controlling interest in CMC. When appellant responded positively, Kyser and respondent Beebe set up a meeting of the seven former partners for March 11, 1972, at the home of respondent Wintermeyer, a former CMC partner who had served on the board of

directors and performed internal accounting services for CMC.

Appellant Jenkins testified that before his first meeting with respondents about the contract he studied the shareholder materials sent to him by CMC for the shareholders' meeting of the previous month. Appellant and respondents discussed CMC's financial condition in general terms and respondents assured him that the company would "run like a sewing machine" with an influx of capital and the replacement of the former O&P directors on the CMC board.

A contract previously prepared by Kyser, though not previously shown to appellant, was brought to the meeting and copies distributed to each of the former partners and appellant. Clark testified that he relied upon Kyser's advice to him that the contract with Jenkins for sale of the securities would be legal. The contract provided that the seven former partners would sell their 1,400,000 shares of common stock (which was approximately forty-two percent of CMC common stock), 96,799 shares of preferred stock,[1] (respondents had, on June 23, 1971, waived the conversion privilege of their preferred shares, a fact unknown to appellant), their debenture bonds and Class B bonds[2] for $500,000. The contract also contained a recital that appellant made an unsolicited offer for respondents' interests in CMC and a provision making the contract contingent on appellant's ability to secure an operating capital loan of $500,000 for CMC within 10 days.[3] This contract was signed by appellant and respondents, but the parties disputed the question of whether the Class B bonds provision was stricken

---

1. The 96,799 shares were all that had been issued of the 125,000 authorized shares of preferred.

2. The financial statement showed the debentures to bear 10% interest and showed $145,000 of Class B bonds due in 1976 and 1977 bearing 5% interest.

3. The recital about appellant's making "an unsolicited offer" for respondents' interest in CMC does not affect appellant's claims herein. We note in *Wallach v. Joseph*, 420 S.W.2d 289, 294 (Mo.), *cert. denied sub nom. Friedman v.*

*Wallach*, 389 U.S. 953, 88 S.Ct. 335, 19 L.Ed.2d 362 (1967), that while all prior negotiations are merged into a written instrument and the parties are presumed to have known and accepted its terms, where there is fraud in the inducement, the fraud may be proved by parol evidence. See also 9 J. Wigmore, Evidence § 2439 at 125 (3d ed. 1940). In addition, as set out earlier, there was considerable evidence introduced, all without objection from respondents, showing that the respondents were the ones who solicited the offer from Jenkins.

before execution.[4] Appellant then took the contract to one Bruce Heavner, a Kansas City attorney, who had done legal work for Jenkins previously, to review the document and to secure an appraisal of the preferred stock, debentures and Class B bonds.

After the contract was signed, a supplemental agreement was executed. This agreement provided *appellant with an ex-*tension of time to arrange the operating capital loan and respondents also agreed to cooperate in the turnover of management and serve on the CMC board of directors as long as necessary for a smooth transition. The parties disputed the question of when the supplemental agreement was signed. Appellant claimed it was signed at a meeting a few days after the March 11, 1972 meeting, and respondent Kenneth Van Tuyl, a former CMC partner and director, also testified that he believed it was signed at a second meeting.

While appellant was trying to obtain the operating capital loan, he first learned from a loan officer of the bank that respondents Clark, Van Tuyl and Hughes had previously entered into employment contracts with CMC. He met with respondents again on April 24, 1972, and when this fact was confirmed he told them he could no longer afford the deal and was no longer interested in it; he walked out of the meeting. Jenkins testified that at this point the deal appeared to him to be too great an obligation to take on just for the ranch. Appellant then waited in Kyser's car for a ride home. Kyser further discussed the proposed sale with respondents. Kyser then went to the car and told appellant that respondents were willing to cancel the employment contracts and would accept $140,000 cash and the remaining $360,000 of the purchase price in promissory notes. Appellant returned to the meeting, asked if there

were any other matters of which he had not been told, and after being assured that there were no such matters, appellant agreed to the new terms. This agreement was recorded in a longhand instrument written by Kyser. It made no further reference to the requirement that appellant obtain an operating capital loan. Respondents had decided to go ahead with the sale without requiring the operating loan for the company.

To effectuate the exchange of respondents' interests in CMC for appellant's cash and notes, respondent Wintermeyer collected the various certificates held or controlled by respondents and their relatives and delivered these to Security National Bank in Kansas City, Kansas, the agreed upon transfer agent. With the exception of Wintermeyer's holdings, all of respondents' stock certificates bore the legend:

"These securities have not been registered under the Securities Act of 1933, and have been purchased for investment purposes. They may not be sold or offered for sale in whole or in part in the absence of an effective Registration Statement covering them under the Act, or an opinion of counsel satisfactory to the company that such registration is not required."

Appellant was unaware of the restriction.[5]

The debenture certificates delivered by Wintermeyer to the transfer agent actually showed interest at seven, not ten percent per annum, a fact of which appellant was also unaware.

On April 26, 1972, appellant's account at the First National Bank of Butler, Missouri, was debited and a "Jenkins v. Clark Escrow" was credited with an amount of $140,000 to cover seven money orders, each in the amount of $20,000, to be paid May 5,

---

4. Jenkins' copy of the contract did not have the Class B bonds provision stricken from it, although his copy contained the other changes made at the first meeting, each of which had been initialed by the parties. Respondents' copies had the Class B bonds stricken from them, but this purported revision did not bear the initials of the parties indicating consent to the change as did the other revisions on the

contract. The evidence was unclear whether any Class B bonds were extant at the time of the contract.

5. The issue of the effect of the failure to disclose the restriction on the shares to be transferred is raised by appellant, but we do not reach it in view of our disposition of the case.

1972, to each of the seven husband-and-wife respondents as the cash portion of the purchase price of respondents' interests.

On April 27, 1972, respondent Clark resigned from the CMC board of directors and as CMC president. Appellant was at the meeting and was so stunned by this move that a recess had to be called. Appellant testified that he had no intention of personally running the company but had expected Clark to continue as president. Appellant asked Clark when he had decided to resign and whether he had given sufficient thought to this decision. After the meeting resumed, appellant's son, Karl Jenkins, was elected to fill Clark's place on the board. On respondent Beebe's motion, Kyser was elected president and chairman of the board. Appellant testified he did not know until discovery in this case that the night before the April 27, 1972 meeting, Kyser had asked Beebe to call Clark and ask for Clark's resignation, and that Beebe did so.

On May 5, 1972, Security National Bank sent appellant a letter informing him that it was holding, as CMC's transfer agent, the CMC stock certificates and seven percent debentures which would be reissued to him. Also on May 5, 1972 appellant applied for a loan from the Small Business Administration through First National Bank of Butler for $350,000.

On May 6, 1972, appellant closed his purchase of respondents' interests by delivery of the seven $20,000 money orders to respondents together with promissory notes in aggregate sum of $360,000 for the balance of the purchase price. Each note was dated May 6, 1972, bore interest at seven percent per annum and contained an acceleration clause. The first interest payment on the promissory notes was due on August 10, 1973 and then subsequently on August 10th in following years. The debentures which appellant received in the transaction also had an August 10th payment date.[6]

After receipt of the letter dated May 5, 1972, from the transfer agent, appellant notified the transfer agent that the debentures were to pay ten percent interest, as they were stated to provide in the financial statement sent appellant in connection with the February 1972 CMC shareholders' meeting. On May 12, 1972, the Small Business Administration approved the loan for $350,000 to CMC, upon the personal guarantees of appellant Jenkins, Kyser, Hayes, Beebe and Wagener; with the exception of appellant, each was a member of the CMC board of directors.

On June 26, 1972, the transfer agent forwarded to appellant the certificates of stock newly issued in his name. These certificates did not bear the restrictive legend. On July 21, 1972, the transfer agent sent to appellant seven unsigned debentures, dated March 25, 1970, bearing ten percent interest representing "reissuance of previously issued debentures," with instructions that they be signed by the president and secretary of CMC. Appellant took the debentures to Kyser, the president of the company, for appropriate signatures and seals and subsequently received the debentures backdated as of 1970, signed by Clark as CMC president and Wagener as CMC secretary, positions held by the two in 1970. Nothing appears in the record as to how Clark and Wagener could obligate the corporation to 10% in place of 7% debentures.

Soon after Clark's resignation, after Jenkins had already personally guaranteed the $350,000 S.B.A. loan to CMC, representatives of CMC's single source of commercial credit, James Talcott, Inc., met with appellant. For the first time, appellant learned that he personally had to guarantee the loans of $927,009 if CMC was to continue to receive the credit necessary for plant operations; appellant had not been told that respondents had previously been required to give their personal guarantees for this amount. Appellant was advised by Heavner, his attorney, to salvage what he could

---

6. Appellant attempted to establish, but the offer of proof was refused, that selection of August 10 as the date on the promissory notes was not a coincidence, but was a critical aspect of the financing plan, as August 10 was also the date on which appellant was to receive the interest and principal payments on the debentures.

from CMC. Appellant tried to sell all the stocks and assets of CMC, except for the Mexican ranch. He was unable to arrange an acceptable contract because he could not obtain an unqualified financial statement as to CMC's cash flow prospects.

When CMC's first payment of interest on the debentures was due to appellant on August 10, 1972, appellant refrained from taking the amount due him for fear of pushing CMC into insolvency. The following year, on August 10, 1973, appellant again did not receive payment on the debentures. Also on August 10, 1973, appellant defaulted on the first payment on his promissory notes to respondents. Shortly thereafter, in late 1973, CMC's creditors forced the corporation into involuntary bankruptcy by filing a petition under the bankruptcy laws. On May 15, 1974, respondents filed this suit on the promissory notes.

At the lengthy trial over the promissory notes, appellant, as said earlier, asserted affirmative defenses under the securities laws and a counterclaim for damages based on fraud. Appellant testified that in purchasing the securities from respondents he relied upon information supplied in the shareholders' materials sent to him for the February 1972 CMC shareholders' meeting, particularly the following:

(a) The audited report for the year ended July 31, 1971 stated that the interest rate on the debentures was 10% per annum. (Respondent Clark admitted this was incorrect; that the rate was in fact 7%).

(b) The audited report indicated that payment of principal and interest on the debentures was to commence August 10, 1971. (The letter from the board of directors failed to state that such payments were not made and the Notice of Annual Meeting failed to state that respondents, Otho Clark, Ocie Hughes and Kenneth Van Tuyl had entered into employment contracts with the company and had, therefore, cancelled and waived the right to receive interest due on debentures held by them).

(c) The audited report stated that "During October, 1971, The Company obtained an appraisal of the land in Mexico to ascertain the value of land at the time of acquisition in March of 1970. As a result of the appraisal, the Company restated the value assigned to the land and increased additional paid in capital by $254,128.00." The report stated that the land in Mexico was previously reported at $73,872.00 and that its value as restated is $328,000.00. (The report failed to state that a dispute existed with respect to the title of the land held by CMC, that its value was questionable, and that it could not be sold).

(d) The audited report stated that "The Company is authorized to issue 125,000 shares of 7% noncumulative and nonvoting preferred stock, par value $10.00 a share, redeemable at $10.50 a share. The Company has issued 96,799 shares of its preferred stock." (The report failed to state that in June of 1971 respondents, who held the entire 96,799 shares, had waived the conversion privileges attendant to such preferred stock).

(e) The audited report stated "Notes payable to James Talcott, Inc. are collateralized by the accounts receivable, inventory, and equipment of the Company and its consolidated subsidiary. They are also collateralized by real estate at the company's home office. The company's unconsolidated subsidiary, Mid-City Freight Lines, Inc., has pledged its accounts receivable and equipment as collateral on the notes." (The report failed to state that James Talcott, Inc. had required as additional security the personal guarantees of respondents for the notes totalling $927,009.00).

(f) The letter from the board of directors dated January 17, 1972, stated "Your management has spent considerable time in the past year in an attempt to sell our Mexican held property. It was advertised in the Wall Street Journal, and we received nearly 100 replies. At the present time, no sale has been consummated. Continuing attempts are being made for the eventual sale that will

be acceptable to all concerned." (The letter failed to state that the title to the Mexican ranch held by CMC was in dispute and that it was of questionable value and that therefore it could not be sold).

(g) The letter from the board of directors dated January 17, 1972, stated "The revenues from Mid-City Freight Lines, Inc. increased during the past year. The rolling stock is being rapidly updated. This investment showed an operating profit of $3,305 after a $36,000.00 occupancy charge was paid to parent Clark Manufacturing Company." · (Mid-City Freight Lines, Inc., was in fact losing money. In addition, the letter failed to disclose that the board of directors of CMC had voted to sell the subsidiary).

(h) The audited report stated that the company had made investments in and advances to Sanders Farms, Inc. in the amount of $570,664 and that "It is the opinion of management that they will realize the carrying amount of the investments and advances upon disposal." (The report fails to disclose management's concern about recovering the investments and advances to Sanders Farms, Inc.).

It was appellant's position that these alleged misrepresentations and omissions of facts necessary to make the statements not misleading were sufficient to bar respondents' suits on the notes pursuant to § 409.411(f), RSMo 1978:

"No person who has made or engaged in the performance of any contract in violation of any provision of this act or any rule or order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or per-

formance was in violation, may base any suit on the contract."

and § 409.101:

"It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . ."

In the trial court's order sustaining respondents' motion for judgments notwithstanding the verdicts, the court concluded that there was no evidence sufficient as a matter of law to warrant submission to the jury of either appellant's affirmative defenses to respondents' claims or appellant's counterclaim for damages based on the alleged fraudulent misrepresentations.

II

As earlier said, we have considered the evidence favorable to the verdict and disregarded respondents' evidence except insofar as it supports the jury's verdicts. We conclude that the trial court erred when it entered judgments for respondents notwithstanding the verdicts for the appellant on both respondents' claims and appellant's counterclaim.

The testimonial evidence clearly established numerous defects in the CMC financial statement sent to appellant less than two months before the execution of the disputed contract. The audited report for the year ending July 31, 1971 contained what respondents contended was merely a clerical error: the report stated that CMC's debentures paid ten percent interest.[7]

---

7. The debentures as originally issued paid seven percent interest. At a special meeting of the board of directors held on January 6, 1971, a resolution was adopted increasing the interest rate on the debentures from seven to ten percent, effective August 1, 1970, "as an effort to partially compensate the holders of said debentures for the loss of revenue incurred by said debenture holders during the past two years, for which period of time the accrued interest had been abated." The resolution was adopted

unanimously, but four of the seven directors held seven percent debentures and were thereby "interested" parties in the transaction, which would impair the validity of such a self-serving resolution. See 11 W. Fletcher, Private Corporations §§ 936–938 (1975).

It is not clear from the minutes of the meeting whether the foregoing was a separate resolution of the board of directors or whether it was part of an agenda of resolutions to be submitted to the stockholders at the annual

When the transfer agent notified appellant that it was holding seven percent debentures for him, he informed the transfer agent that the debentures were to bear ten percent interest according to the financial statement. The transfer agent then issued back-dated ten percent debentures which Clark subsequently signed, even though he knew that the original debentures called for seven percent. The audited report also indicated that the annual interest payment on the debentures was to begin August 10, 1971. Neither the letter to shareholders nor the respondents personally informed appellant that the corporation was unable financially to make any payment on the debentures on the first due date. In fact, the debentures never paid any interest, before or after their sale to appellant. Because appellant was faced with annual payments on the promissory notes due on August 10th of each year, the same day the debentures were to pay appellant interest, this undisclosed fact was important to appellant's entering into the contract of sale.

The audited report stated that as a result of a new appraisal of the Mexican ranch, its value was restated as $328,000, representing an increase in CMC "paid in capital" of $254,128. The report omitted the fact that the increased appraisal assumed CMC's undisputed title to the ranch. In fact, respondent Clark testified that at the time of the report, the directors knew that the ranch may have had an unmarketable title because of a dispute over whether it had been previously sold to another buyer prior to the purported acquisition by O&P. No mention was made of the fact that CMC's board of directors had considered placing a zero value on the ranch in the documents prepared but not officially submitted for registering CMC securities with the state. Respondent Beebe testified that even after CMC went into bankruptcy, the title to the ranch had not been cleared up. Even though respondents knew that appellant's desire to obtain the ranch was his purpose in entering the contract, they told him nothing about the serious question as to whether CMC even had title to the ranch.

Neither the letter to shareholders nor the audited report disclosed the fact that conversion privileges of the preferred stock had been waived by respondents. Appellant testified that the conversion privilege was important to him as part of his plan to acquire the ranch by returning his common shares to CMC in exchange for the ranch.

The audited report stated that CMC's single source of commercial credit, James Talcott, Inc., had collateralized CMC's accounts receivable, inventory and equipment. Respondents Clark and Beebe acknowledged that the report did not disclose the critical fact that Talcott also required personal guarantees of $927,009 by respondents. Even though respondents knew appellant was already having difficulty financing the purchase of their interests and had previously walked out of contract negotiations when he had discovered the additional financial obligation presented by the employment contracts, they never told him that unless he personally guaranteed the loans for $927,009, CMC would lose its only line of credit and become insolvent.

The report also stated as management's belief the opinion that CMC's investments in and advances to the California property in the amount of $570,664 would be recovered, but failed to state the fact that management was very doubtful as to whether this money could ever be recovered. Respondent Beebe testified that he had opposed CMC's investments in the California property because he believed that it was too far away to be economically controlled. Respondent Hughes testified that the California property investments were a matter of great concern to the seven former CMC partners and that they were afraid that these investments and the modular housing subsidiary would break the company. Respondent Hughes, the former CMC supervisor for production, also said that the letter to shareholders falsely stated that CMC had other items on the drawing board for future production.

meeting scheduled for February 5, 1971. If it were the latter, Clark testified that no such

resolution was ever submitted to the shareholders.

Respondent Clark testified that the letter to shareholders that accompanied the CMC audited financial report had been put through several drafts so as to de-emphasize the real losses suffered by CMC subsidiaries. The actual loss figures were deleted from the letter. The truck line subsidiary was losing $118,000 but was reported as operating at a profit. Several losses were reported as substantially "occupancy billings" paid to the parent CMC company in order to disguise their severe losses. Moreover, the January 17, 1972 letter failed to mention that since the audited report dated July 31, 1971, the company's financial condition had steadily worsened. Several of respondents testified that they saw the sale to appellant as a way to get out from under this load, the steadily worsening financial condition of the company.

■ Respondents made no effort to correct the false impressions created by the misrepresentations and omissions in both the audited report and the letter sent to shareholders.[8] Nor was there any evidence that Kyser, whether acting as counsel to Clark, CMC or appellant, either knew of any of these misrepresentations and omissions or told appellant about them. Appellant testified that Kyser never told him about the undisclosed problems that CMC was facing. Appellant's evidence, therefore, amply supported the jury's verdict in favor of his affirmative defense that respondents' suit on the promissory notes was barred by § 409.411(f), RSMo 1978, because respondents violated the state security laws prohibiting misstatements and omissions of material facts in the connection with the sale of securities.[9]

Appellant's counterclaim for damages alleged that respondents knowingly induced him to purchase securities by fraudulently misrepresenting and concealing facts material to his purchases. The elements of common law fraud include:

"a representation; its falsity; its materiality; the speaker's knowledge of its falsity or his ignorance of its truth; the speaker's intent that his statement should be acted upon by the person and in the manner reasonably contemplated; the bearer's ignorance of the falsity of the statement; his reliance on its truth; his right to rely thereon; and his consequent and proximately caused injury."

*Ackmann v. Keeney—Toelle Real Estate Co.,* 401 S.W.2d 483, 488 (Mo.banc 1966).

■ In the case at bar, appellant testified that at the April 24, 1972, meeting he was upset upon learning of the employment contracts entered into with CMC by Clark, Hughes and Van Tuyl. He repeatedly questioned respondents as to whether there were other matters undisclosed to him. At this point, not one of the respondents corrected the false impressions appellant obviously would have held in reliance on the February 1972 shareholders' materials. Silence can be an act of fraud where matters are not what they appear to be and the true state of affairs is not discoverable by ordinary diligence. *Lindberg Cadillac Co. v. Aron,* 371 S.W.2d 651, 653 (Mo.App.1963). There was ample evidence for the jury's verdict for appellant upon his counterclaim for damages based on respondents' fraud, viewing the evidence favorable to the ver-

**8.** Respondents also argue that appellant at the time of the sale was an "insider", citing federal cases under the federal securities law and that, accordingly, the protection of the securities laws was unavailable to him. This is an erroneous statement of the law. Federal law defines an insider as an officer, director or an owner of more than ten percent of any class of securities. *Blau v. Lamb,* 363 F.2d 507, 514 (2d Cir. 1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967); 15 U.S.C. § 78p(a). At the time of sale appellant was none of these. Even if appellant were an "insider" under federal law, the protection of the securities laws

was available to him. The expressed policy of the securities laws is to prevent fraud by any person and the securities laws apply to insiders' dealings with other insiders. *Myzel v. Fields,* 386 F.2d 718, 739–40 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

**9.** Respondents explicitly do not advance the argument that their suit on the promissory notes is not an action on the contract of sale of the securities. In their brief, respondents acknowledge that "[s]uch hairsplitting is more a matter of semantics than substance."

dict and disregarding respondents' evidence except insofar as it supports the verdict: there were representations which were false and misleading; these misrepresentations were material to the transaction; respondents knew of the falsity of some statements and could not attest to the truth of other statements; several of the respondents actually prepared and sent out the shareholder materials containing the misrepresentations, all of the respondents deceived appellant through their silence as to the misrepresentations; respondents knew appellant would act on the misrepresentations, their assurances that the company "would run like a sewing machine," and their silence when asked of other matters undisclosed to appellant; respondents knew appellant did not know of the misrepresentations and omissions; appellant reasonably relied upon the public accountant's audited reports and other shareholder materials and had a right to rely upon these; and appellant was consequently injured because of these misrepresentations because appellant did not receive the assets he was lead to believe he was acquiring, CMC was not making the profits nor paying interest on its debentures as appellant was lead to believe, and the corporation soon went into bankruptcy.

### III

In granting respondents' motion for judgment notwithstanding the verdicts, the trial court also conditionally granted respondents' motions for new trials on the grounds that appellant's instructions were erroneous and that there was no evidence to support the instructions.[10] Whether an instruction is erroneous is a question of law to

be determined upon the record presented and is not a matter within the trial court's discretion. *Highfill v. Brown*, 340 S.W.2d 656, 664 (Mo. banc 1960). Where an instruction, as a matter of law, is not erroneous in view of the record, it is error for the trial court to grant a new trial on the ground that the instruction was improper. *Id.* Likewise, the granting of a new trial because there is said to be insufficient evidence to submit an issue to the jury is not an exercise of judicial discretion but rather is a determination of a legal question. *Bierman v. Langston,* 304 S.W.2d 865, 867 (Mo.1957). We have considered the instructions given to the jury and the evidence to support the instructions and we conclude that the trial court erred when it conditionally granted respondents' motion for new trial.

### A

Appellant's affirmative defenses to respondents' claims on the promissory notes were predicated upon §§ 409.411(f) and 409.101, RSMo 1978. There are no Missouri Approved Instructions for the submission of these defenses. Rule 70.02(e) provides that where there are not applicable approved instructions, the instruction given "shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." The ultimate test of an instruction not in MAI is whether it follows the substantive law and can be readily understood. *Streeter v. Hundley,* 580 S.W.2d 283, 287 (Mo. banc 1979). And in cases involving a statutory violation, it is generally sufficient to couch a verdict-directing instruction sub-

---

10. Respondents submitted verdict-directing instructions Nos. 2 through 8, each identical except as to payee and amount, which required the jury to return verdicts for the seven husband-and-wife respondents for the amount of the promissory note each couple held, plus interest, unless the jury believed that recovery was barred by reason of appellant's instructions Nos. 9 and 10. Appellant submitted the following instructions: Nos. 9 and 10, which required the jury to return verdicts for appellant on respondents' claims if the jury believed respondents made any untrue statement of ma-

terial fact or omitted to state a material fact necessary to make the statement made not misleading; Nos. 11 through 15, each predicated on MAI 23.05, which required the jury to return a verdict for appellant on his counterclaims alleging fraudulent misrepresentations in regard to the value and annual rainfall of the Mexican ranch, the losses of CMC subsidiaries, and the financial condition of the CMC parent company; and No. 16, a damages instruction predicated on MAI 4.01. Appellant submitted other instructions which were refused.

stantially in the language of the statute unless the statutory language requires construction. *May v. Bradford*, 369 S.W.2d 225, 228 (Mo.1963).

■ Appellant tendered instructions No. 9 and No. 10 which couched appellant's defenses in language identical to the securities laws, § 409.101, RSMo 1978. Instruction No. 9 provided:

"Your verdict must be for defendant Jenkins on plaintiffs' claims against him if you believe that plaintiffs, in connection with the sale of Clark securities to defendant Jenkins, directly or indirectly made any untrue statement of a material fact."

Instruction No. 10 provided:

"Your verdict must be for defendant Jenkins on plaintiffs claims against him if you believe that plaintiffs, in connection with the sale of Clark securities to defendant Jenkins, directly or indirectly omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

Instructions No. 9 and No. 10 were simple, brief, impartial, free from argument and did not require detailed evidentiary findings by the jury and thus were in accord with Rule 70.02(e). They followed the substantive law providing that a violation of the disclosure requirements of the securities laws will bar a suit based on the contract to sell the security in accord with § 409.411(f). The language of the instructions could be readily understood. They were couched in the language of the statutory violation, language clear on its face and not requiring construction, and thus were in accord with the general rule stated in *May*, 369 S.W.2d at 228.

Respondents argue, without benefit of cited authority, that the instructions presented the jurors with a mass of information and did not require them to find specific acts upon which to base their verdict; further, that the jurors were instructed that they could use any of this information for any purpose and were thereby given a "roving commission." The answer to these contentions is that the instructions did require the jury to find specific acts by respondents pertaining to untruths and omissions of material facts in connection with the sale of securities to appellant. A representation is material "if it relates directly to the matter in controversy and is of such a nature that the ultimate result would not have followed . . . if the one who acts upon it had been aware of its falsity." *Schoen v. Lange*, 256 S.W.2d 277, 281 (Mo.App.1953). The requirement of these instructions that any untruths or omissions found be material did not permit the jury to use any information for any purpose. If respondents were of the view that the instructions were too general, it was their duty to offer more specific ones, *Boten v. Brecklein*, 452 S.W.2d 86, 93 (Mo. 1970), which they did not do.

MAI contemplates that the jury will be properly advised by the argument of counsel concerning details. The argument on both sides as contained in the record shows that the matter of what was and was not a material fact and what statements were made or not made in relation thereto was argued at length.

We conclude that instructions Nos. 9 and 10, in presenting appellant's affirmative defenses based on the securities laws, did not license the jury with a roving commission and that the instructions limited the jury to a determination of the ultimate facts in issue and were not erroneous. The sufficiency of the evidence to support the jury's verdict based upon these instructions has already been considered above.

B

■ Appellant's counterclaims for damages were submitted to the jury in instructions Nos. 11–15, based upon the allegations of misrepresentations concerning the value of the Mexican ranch, the losses of CMC subsidiaries, the annual rainfall on the Mexican ranch, and the purported successful financial condition of the CMC parent company despite subsidiary losses. Each instruction was predicated upon MAI 23.05

for fraudulent misrepresentations. The trial court was of the view that these instructions were erroneous in that the instructions did not require the jury to find that appellant acted reasonably in relying upon the alleged misrepresentations.

■ Respondents certainly were in a better position to know the truth than was appellant and, accordingly, appellant had a right to rely upon their statements and representations. *Messina v. Gruebel*, 358 Mo. 439, 215 S.W.2d 456, 458 (Mo.1948). The general rule is stated in *Meyer v. Brown*, 312 S.W.2d 158, 161 (Mo.App.1958): "The right to rely on representations is generally conceded where the hearer lacks equal facilities for ascertaining the truth, as where the facts are peculiarly within the knowledge of the speaker and are difficult for the hearer to ascertain  .   .   ."

■ The former partners were the founders of the corporation and had acted as a bloc to exercise effective control over the corporation. A group of stockholders who act together to exercise effective control over a corporation are fiduciaries in their dealings with minority shareholders. *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Kirtz v. Grossman*, 463 S.W.2d 541 (Mo.App.1971). "[T]hey are generally considered trustees, with the attendant duties of trustees towards the beneficiaries, i. e., the minority stockholders." 13 W. Fletcher, Private Corporations § 5765, at 62 (1970). "When the dual relationship of individual and fiduciary creates a conflict of interest the fiduciary relationship must prevail." *Seagrave Corp. v. Mount*, 212 F.2d 389, 396 (6th Cir. 1954).

■ All of the former partners had served on the CMC board of directors at least seven years; three had served continuously from incorporation in 1963 until 1972. At the time of the contract of sale, respondents Clark and Beebe were directors. "A director of a corporation occupies a position of the highest trust and confidence and the utmost good faith is required of him in the exercise of the powers conferred upon him." *Gieselmann v.*

*Stegeman*, 443 S.W.2d 127, 136 (Mo.1969). It is clear that the shareholder materials sent out by the board of directors for the February 1972 shareholders' meeting were within the exercise of the powers conferred upon them. "It is the uniform rule that a director or officer of a corporation occupies fiduciary relation to the corporation *and its shareholders*." *Ramacciotti v. Joe Simpkins, Inc.*, 427 S.W.2d 425, 431 (Mo.1968) (emphasis added). Absent any evidence (and there was none) that appellant had anything to do with the financial affairs of the company, he had a right to rely on the audited report and letter to shareholders that the directors should have prepared with the utmost good faith required by their fiduciary duties. *See Fendelman v. Fenco Handbag Manufacturing Co.*, 482 S.W.2d 461 (Mo.1972) (former corporation president, inactive in the financial affairs of the company as assistant treasurer, had a right to rely upon the corporation's directors and managing officers).

■ Appellant Jenkins cannot be held chargeable with imputed knowledge of CMC's books and records or the resolutions passed by the CMC board of directors. "A stockholder, because of his status, ordinarily is not chargeable, as a matter of law, with knowledge of the internal affairs of the corporation  .   .   .  A stockholder is not bound to the strict rule as to knowledge of a corporation that applies to officers and directors  .   .   .  [nor] with knowledge of the insolvency of the corporation, nor with knowledge of resolutions adopted by the board of directors, so far as they do not affect his status or rights as a stockholder." 13 W. Fletcher, Private Corporations § 5711 at 16 (1970). *See Prewitt v. Sunnymead Orchard Co.*, 189 Cal. 723, 209 P. 995 (1922) (purchaser of stock held not chargeable with knowledge of facts contained in corporate books); *Pearsall v. Western Union Telegraph Co.*, 124 N.Y. 256, 26 N.E. 534 (1891) (shareholder held not chargeable with knowledge of resolutions of the board of directors).

Respondents contend that Kyser's knowledge as a director of CMC was imputed to

appellant because of the attorney-client relationship. The factual issue of whether Kyser and Jenkins continued the attorney-client relationship was hotly disputed at trial. Kyser said that he acted as Jenkins attorney throughout the period of the transactions. Jenkins testified that he did not. Jenkins testified that he had hired Kyser from time to time to assist him in purchasing farm land and had paid him on a transaction basis. Jenkins had not paid Kyser at any time throughout the period of the transactions. In fact, Jenkins hired Heavner, an attorney who had previously done legal work for him to advise him on the contract because it was evident to Jenkins that "you can't serve two masters. Mr. Kyser was working for Clark." This belief is reasonable, supported by evidence of appellant's knowledge that Kyser had joined the CMC board of directors as a Clark ally and was being paid a salary of $200 per week for his services. Jenkins testified that when Kyser approached him about the possibility of acquiring the Mexican ranch by purchasing respondent's interests in CMC, he appeared to be acting on behalf of the respondents.

There was ample evidence for the jury to believe that Kyser was not acting as appellant's attorney throughout these transactions but was instead serving the interests of respondents. Indeed, respondent Clark testified that he went along with the deal on Kyser's assurances to him that the contract was legal. Jenkins testified that before the first meeting with respondents about the sale, Kyser had not shown him the contract which he had prepared prior to the meeting. Sometime during the discussions of the contract, Kyser refused to consider Jenkins' request that there be a reduction in the purchase price after the Class B bonds were stricken from the contract. Kyser told Jenkins to take it or leave it, which left no room for a reduction in the contract price even though the deletion of this provision meant that Jenkins was getting less than what he thought he would get. There was no evidence presented that indicated that Kyser acted on appellant's behalf in his performance of duties as a CMC director before the sale or that Kyser solicited appellant's opinion before casting his vote for the board of directors. Nor is there any evidence that Kyser told appellant before the sale about any information he may have learned relevant to the misrepresentations and omissions of respondents or that Jenkins gave Kyser carte blanche authorization to act on his behalf at any point in these transactions.

■■■ Irrespective of the factual controversy of whether Kyser remained appellant's attorney during the disputed transactions, Kyser's knowledge cannot be imputed to appellant. Whether notice to or knowledge of an attorney serving on a corporate board of directors is imputed to his client, is not a question of corporation law but is governed by the law governing the attorney-client relationship. See 3 W. Fletcher, Private Corporations § 807 at 4849 (1975). The general rule is that knowledge of a party's attorney in a course of his employment is knowledge of or is imputed to the client. *Leith v. Merchantile Trust Company National Association*, 423 S.W.2d 75, 86 (Mo.App.1967); 7 Am.Jur.2d *Attorneys at Law* § 108 (1963). But it is the longstanding rule that the knowledge an attorney acquires while in the service of one client will not be imputed to another client, *Ford v. French*, 72 Mo. 250, 252–53 (1880), especially where it is distinctly in the interest of one client to conceal this knowledge from the other. 7 Am.Jur.2d *Attorneys at Law* § 108 (1963). Whatever knowledge Kyser had during the disputed transactions, cannot be imputed to appellant under the facts of this case.

■■ The trial court also found error in the fraud instructions and instruction No. 16 for damages, on the basis that the submission of appellant's counterclaim together with his affirmative defense in effect permitted appellant to recover partial payment and still keep the benefit of his bargain. Appellant submitted instruction No. 16, a damages instruction based on MAI 4.01, rather than an instruction based upon recovery of the "benefit of the bargain." Ap-

pellant sought damages in the amount of his down payment and incidental expenses, which he sufficiently proved at trial, and received a jury award which did not amount to the total amount of the damages he claimed. At trial, appellant tendered the securities to respondents in the event that judgment were entered in his favor. Consequently, appellant was not given the "benefit of the bargain" as well as recovery of his partial payment; the securities must be returned to respondents.

In short, the verdict-directing instructions given the jury on appellant's counterclaim for damages were not erroneous. The sufficiency of the evidence to support the jury's verdict based upon these instructions has already been considered above.

### C

■■■ Respondents argue that the jury instructions on appellant's affirmative defenses and counterclaim were erroneous because the instructions did not distinguish the male respondents from the female respondents, the latter group having had no direct contact with appellant in any of the disputed transactions. Additionally, respondents allege error in the inclusion of respondents Elbert Bayne, Paul Landsberg, Ocie Hughes and Victor Wintermeyer as parties to the misrepresentations and omissions in the shareholders' materials, because there was no evidence that they served on the board of directors at the time of the publication of the materials or that they participated in the preparation of the materials. Both of these allegations of error lack merit.

"[N]either husband nor wife has the power to act as the other's agent merely by virtue of the marital relation, but the fact that a husband is habitually permitted by the wife to attend to some of her business affairs . . . furnishes some basis for finding that he is authorized to attend to all of her business affairs." *Vaughn v. Great American Insurance Co.*, 390 S.W.2d 622, 627 (Mo.App.1965) (citing Restatement (Second) of Agency § 22, comment b at 94). We stated the general rule concerning the agency of spouses in *Ethridge v. Perryman*, 363 S.W.2d 696, 701–02 (Mo.1963):

"The agency of a husband for his wife may be shown by direct evidence or by facts and circumstances which will authorize a reasonable and logical inference that he was empowered to act for her or that she ratified his unauthorized acts. . . . A wife by her actions and conduct may be estopped to deny her husband's authority to act as her agent for her in her behalf."

In the case at bar, each wife owned shares of CMC common stock in joint tenancy with her husband. The evidence is that as to the jointly held stock, the husbands were the ones who always attended the meetings and negotiations leading up to the sale of the stock to appellant, whereby both husbands and wives would find escape from a losing venture. The husbands thus were attending to the business affairs of the respective joint owners and it is entirely reasonable to believe they did so with the implied, if not the express, assent of their spouses. Each ratified the sale of her share by signing the power of attorney on the reverse side of each certificate to effect transfer of the stocks. Each is estopped to deny her husband's authority to act on her behalf.

In any event, "a person may be charged with fraud even though he is not a party to the transaction into which the complainant is induced, by the misrepresentation, to enter, particularly where such third person profits from the fraud and retains the benefits thereof." 37 Am.Jur.2d *Fraud and Deceit* § 307 at 407–08 (1968); *see also Abrams v. Roseth Corporation*, 249 App.Div. 413, 292 N.Y.S. 445 (App.Div.1937). Additionally, for appellant to prevail here, the wives will lose nothing they would have had but for the fraud. Even if they did not participate in the fraud actively, they would be unjustly enriched were it to succeed. *White v. Mulvania*, 575 S.W.2d 184, 189 (Mo. banc 1978). They, along with their husbands, should be required to return appellant's down payment of $140,000, in accordance with the jury's verdict, while appellant, in accord with the tender which he

made in the event judgment were entered in his favor, returns to the joint owners the stock and debentures received by him. Both sides are thus returned to their respective positions before the fraud.

■■■ As to respondents Bayne, Landsberg, Hughes and Wintermeyer, the evidence supported their inclusion as parties to the misrepresentations and omissions. Each of these respondents had been former partners, officers and members of the board of directors of CMC. Each was present at the various meetings and transactions involved in this dispute. Moreover, each was present when on April 24, 1972, appellant asked if there were other matters that had not been disclosed to him relevant to the sale. Each had assured appellant or sat in silence as appellant had been assured that he had been informed of all relevant matters.

### IV

We need not address appellant's other claim that because the securities in issue were not registered under the state securities laws, the trial court erred in denying appellant's motion for a directed verdict on respondents' claim. That inquiry is unnecessary because of the ruling that the jury's verdicts are to be reinstated and the trial court's order conditionally granting respondents a new trial is to be set aside.

As we noted above, in our review of the trial court's decision sustaining a motion for judgment notwithstanding the verdict, we consider only the evidence favorable to the verdict and disregard movant's evidence except insofar as it supports the jury's verdict. Respondents' arguments disputing appellant's evidence and reiterating respondents' evidence is an attempt to relitigate on appeal the questions of fact decided by the jury. The evidence presented by appellant, and in no small way corroborated by respondents' evidence, was more than sufficient to support the jury's verdicts.

In conclusion, respondents' violation of the securities laws, as found by the jury, barred recovery on the promissory notes under the unlawful contract. Appellant's counterclaim for return of his down payment and incidental damages was properly submitted to the jury and, given the jury's verdict which found that appellant had been defrauded and returned to him his down payment, appellant must return the securities to respondents. The judgment of the trial court is reversed and the court is ordered to reinstate the jury's verdicts in favor of appellant on respondents' petition and in favor of appellant for $140,000 on his counterclaim and to enter judgment thereon accordingly as of the date of the original verdicts and to set aside the conditional grant of a new trial to respondents, upon appellant's depositing the securities and debentures with the clerk of the circuit court for disposition to or by respondents.

BARDGETT, C. J., DONNELLY, WELLIVER, MORGAN, JJ., and STOCKARD, Special Judge and HENLEY, Senior Judge, concur.

RENDLEN and HIGGINS, JJ., not sitting.